# UNITED STATES *v.* ALASKA

No. 84, Orig.   Argued February 24, 1997—Decided June 19, 1997

O'CONNOR, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined, and in Parts I, II, and III of which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 62.

*Jeffrey P. Minear* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *Michael W. Reed.*

*G. Thomas Koester* argued the cause for defendant. With him on the briefs were *Bruce M. Botelho,* Attorney General

of Alaska, *Joanne M. Grace*, Assistant Attorney General, and *John Briscoe.* \*

JUSTICE O'CONNOR delivered the opinion of the Court.

This original action presents a dispute between the United States and the State of Alaska over the ownership of submerged lands along Alaska's Arctic Coast. In 1979, with leave of the Court, 442 U. S. 937, the United States filed a bill of complaint setting out a dispute over the right to offer lands in the Beaufort Sea for mineral leasing. Alaska counterclaimed, seeking a decree quieting its title to coastal submerged lands within two federal reservations, the National Petroleum Reserve-Alaska and the Arctic National Wildlife Range (now the Arctic National Wildlife Refuge). The Court appointed a Special Master. 444 U. S. 1065 (1980). Between 1980 and 1986, the Special Master oversaw extensive hearings and briefing. Before us now are the report of the Special Master and the exceptions of the parties. We overrule Alaska's exceptions and sustain that of the United States.

I

Alaska and the United States dispute ownership of lands underlying tidal waters off Alaska's North Slope. The region is rich in oil, and each sovereign seeks the right to grant

---

*Briefs of *amici curiae* were filed for the State of Alabama et al. by *Daniel E. Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, and *Jan S. Stevens,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Jeff Sessions* of Alabama, *Grant Woods* of Arizona, *Jane Brady* of Delaware, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Richard P. Ieyoub* of Louisiana, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Jan Graham* of Utah, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, and *Julio A. Brady* of the Virgin Islands; and for the Wilderness Society et al. by *Peter Van Tuyn, Eric Jorgensen,* and *James B. Dougherty.*

leases for offshore exploration and to share in oil and gas revenues from the contested lands.

Several general principles govern our analysis of the parties' claims. Ownership of submerged lands—which carries with it the power to control navigation, fishing, and other public uses of water—is an essential attribute of sovereignty. *Utah Div. of State Lands* v. *United States*, 482 U. S. 193, 195 (1987). Under the doctrine of *Lessee of Pollard* v. *Hagan*, 3 How. 212, 228–229 (1845), new States are admitted to the Union on an "equal footing" with the original 13 Colonies and succeed to the United States' title to the beds of navigable waters within their boundaries. Although the United States has the power to divest a future State of its equal footing title to submerged lands, we do not "lightly infer" such action. *Utah Div. of State Lands, supra,* at 197.

In *United States* v. *California,* 332 U. S. 19 (1947) *(California I)*, we distinguished between submerged lands located shoreward of the low-water line along the State's coast and submerged lands located seaward of that line. Only lands shoreward of the low-water line—that is, the periodically submerged tidelands and inland navigable waters—pass to a State under the equal footing doctrine. The original 13 Colonies had no right to lands seaward of the coastline, and newly created States therefore cannot claim them on an equal footing rationale. *Id.,* at 30–33. Accordingly, the United States has paramount sovereign rights in submerged lands seaward of the low-water line. *Id.,* at 33–36. In 1953, following the *California I* decision, Congress enacted the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.* That Act "confirmed" and "established" States' title to and interest in "lands beneath navigable waters within the boundaries of the respective States." § 1311(a). The Act defines "lands beneath navigable waters" to include both lands that would ordinarily pass to a State under the equal footing doctrine and lands over which the United States has paramount sovereign rights, beneath a 3-mile belt of the ter-

ritorial sea. § 1301(a). The Act essentially confirms States' equal footing rights to tidelands and submerged lands beneath inland navigable waters; it also establishes States' title to submerged lands beneath a 3-mile belt of the territorial sea, which would otherwise be held by the United States. *California ex rel. State Lands Comm'n v. United States,* 457 U. S. 273, 283 (1982). The Alaska Statehood Act expressly provides that the Submerged Lands Act applies to Alaska. Pub. L. 85–508, §6(m), 72 Stat. 343 (1958). As a general matter, then, Alaska is entitled under both the equal footing doctrine and the Submerged Lands Act to submerged lands beneath tidal and inland navigable waters, and under the Submerged Lands Act alone to submerged lands extending three miles seaward of its coastline.

In hearings before the Special Master, the parties identified 15 specific issues for resolution, which we treat in three groups. First, the parties disputed the legal principles governing Alaska's ownership of submerged lands near certain barrier islands along the Arctic Coast. Second, the parties contested the proper legal characterization of particular coastal features, including a gravel and ice formation in the Flaxman Island chain known as Dinkum Sands. Third, the parties disputed whether, when Alaska became a State, the United States retained ownership of certain submerged lands located within two federal reservations, the National Petroleum Reserve-Alaska in the northwest and the Arctic National Wildlife Refuge in the northeast. For each reservation, the Master considered both whether the seaward boundary encompassed certain disputed waters and whether particular executive and congressional actions prevented the lands beneath tidally influenced waters from passing to Alaska at statehood.

Alaska excepts to three of the Master's recommendations. First, it claims that the Master erred in concluding that waters between the Alaskan mainland and certain barrier islands were not "inland waters," the limits of which would

form a portion of the State's coastline for purposes of measuring the State's 3-mile Submerged Lands Act grant. Alaska argues that, at the time of its statehood, the United States had a clear policy of enclosing waters behind near-fringing islands as "inland waters." In abandoning that policy in 1971, Alaska argues, the Federal Government impermissibly "contracted" Alaska's recognized territory. Second, the State challenges the Master's conclusion that Dinkum Sands is not an "island." Under the Master's approach, the low-water line on Dinkum Sands is not part of Alaska's coastline, and the State cannot claim ownership of submerged lands, covering an area of 28 square miles, surrounding the feature. Alaska argues that the Master erred in construing the relevant definition of an "island" and in applying that definition to Dinkum Sands. Third, the State claims that the Master erred in determining that the United States retained ownership of certain submerged lands within the boundaries of the National Petroleum Reserve at Alaska's statehood. Alaska argues both that the Executive lacked authority to prevent submerged lands from passing to Alaska, and that any attempt to include submerged lands within the Reserve was not sufficiently clear to defeat Alaska's title under the equal footing doctrine or under the Submerged Lands Act.

The United States excepts to the Master's recommendation concerning the Arctic National Wildlife Refuge. The Master concluded, among other things, that an administrative application for the Refuge was insufficient to "set apart" submerged lands within the proposed boundaries. As a result, the Master concluded, submerged lands within the Refuge passed to Alaska at statehood.

We consider these exceptions in turn.

## II

By applying the Submerged Lands Act to Alaska through the Alaska Statehood Act, see Pub. L. 85–508, § 6(m), 72 Stat.

343 (1958), Congress granted the State title to submerged lands beneath a 3-mile belt of the territorial sea, measured from the State's "coast line." 43 U. S. C. §§ 1301(a)(2), 1311(a). The Act defines the term "coast line" as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." § 1301(c). Alaska's first exception requires us to consider how the presence of barrier islands along its northern shore affects the delimitation of its coastline. The issue is of primary relevance in the Beaufort Sea, between the National Petroleum Reserve-Alaska and the Arctic National Wildlife Refuge. A joint federal-state sale of mineral leases covering this so-called Leased Area, conducted in December 1979, yielded large sums now held in escrow awaiting the outcome of this suit.

In cases in which the Submerged Lands Act does not expressly address questions that might arise in locating a coastline, we have relied on the definitions and principles of the Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, [1964] 15 U. S. T. 1606 (Convention). See *United States* v. *California,* 381 U. S. 139, 165 (1965) *(California II).* Specifically, the coastline from which a State measures its Submerged Lands Act grant corresponds to the "baseline" from which the United States measures its territorial sea under the Convention. The Government argued before the Special Master that the United States measures its territorial sea from a "normal baseline"—the low-water line along the coast, Art. 3, supplemented by closing lines drawn across bays and mouths of rivers, see Arts. 7, 13. Under Article 10(2) of the Convention, each island has its own belt of territorial sea, measured outward from a baseline corresponding to the low-water line along the island's coast.

Although the United States now claims a territorial sea belt of 12 nautical miles, see Presidential Proclamation No. 5928, 3 CFR 547 (1988 Comp.), note following 43 U. S. C.

§ 1331, we are concerned in this case only with the 3-mile belt of the territorial sea that determines a State's Submerged Lands Act grant. Under Article 6 of the Convention, the outer limit of that territorial sea belt is a line every point of which is three miles from the nearest point of the baseline. This means of measuring the outer limit of the belt is also known as the "arcs-of-circles" method.

Alaska objected to application of the Article 3 "normal baseline" approach to its Arctic Coast. In the Leased Area of the Beaufort Sea, some offshore islands are more than six miles apart or more than six miles from the mainland. If Alaska owns only those offshore submerged lands beneath each 3-mile belt of territorial sea, the United States will own "enclaves" of submerged lands, wholly or partly surrounded by state-owned submerged lands, beneath waters more than three miles from the mainland but not within three miles of an island. Two such federal enclaves exist in the Leased Area between the mainland and the Flaxman Island chain, beneath the waters of Stefansson Sound. To eliminate these enclaves, Alaska offered alternative theories for determining the seaward limit of its submerged lands in the vicinity of barrier islands. Alaska principally contended that the United States should be required to draw "straight baselines" connecting the barrier islands and to measure the territorial sea from those baselines. Article 4 of the Convention permits a nation to use straight baselines to measure its territorial sea "[i]n localities where the coast line is deeply indented and cut into, or if there is a fringe of islands along the coast in its immediate vicinity." The parties agree that Alaska's coastline satisfies this description. Under this approach, waters landward of the baseline would be treated as "inland" waters, and Alaska would own all submerged lands beneath those waters.

The Master rejected this approach, finding that the use of straight baselines under Article 4 is permissive, not mandatory, and that the decision whether to use straight baselines

is normally one for the Federal Government. Report of the Special Master 45 (hereinafter Report). The United States has never opted to draw straight baselines under Article 4. See *California II, supra,* at 167–169; *United States* v. *Louisiana,* 394 U. S. 11, 72–73 (1969) *(Louisiana Boundary Case); United States* v. *Louisiana,* 470 U. S. 93, 99 (1985) *(Alabama and Mississippi Boundary Case); United States* v. *Maine,* 475 U. S. 89, 94, n. 9 (1986) *(Massachusetts Boundary Case).* As a variant of its straight baselines argument, Alaska claimed that the United States has historically treated waters between the mainland and fringing islands as "inland waters," so long as the openings between the off-lying islands are no more than 10 miles wide. Alaska did not argue that the United States had ever specifically asserted, in its dealings with foreign nations, that the waters of Stefansson Sound are inland waters. Rather, Alaska attempted to identify a general but consistent "10-mile rule" invoked by the United States in its domestic and international affairs. If applied to Alaska's Arctic Coast, the State argued, this rule would require treating the waters of Stefansson Sound as inland waters.

The Master examined the boundary delimitation practices of the United States and concluded that the United States did not have a well-established rule for treating waters between the mainland and fringing islands as inland waters. The Master recognized that, in the *Alabama and Mississippi Boundary Case,* we suggested that between 1903 and 1961 the United States had "enclos[ed] as inland waters those areas between the mainland and off-lying islands that were so closely grouped that no entrance exceeded 10 geographical miles." 470 U. S., at 106–107. Observing that this statement was not "strictly necessary" to the decision in the *Alabama and Mississippi Boundary Case,* the Master declined to rely on it here. The Master therefore concluded that, for purposes of measuring Alaska's submerged lands, the State's

coastline should correspond to a normal baseline under Article 3 of the Convention.

For the reasons discussed below, we find no error in the Master's approach.

## A

Under the Convention, a nation's past boundary delimitation practice is relevant in a narrow context: specifically, when a nation claims that certain waters are "historic" inland waters under Article 7(6) of the Convention. If certain geographic criteria are met, Article 7(4) of the Convention permits a nation to draw a "closing line" across the mouth of a bay and to measure its territorial sea outward from that line. Waters enclosed by the line are considered internal waters. Article 7(6) also permits a nation to enclose "historic" bays, even if those waters do not satisfy the geographic criteria of Article 7(4). For a body of water to qualify as a historic bay, the coastal nation "must have effectively exercised sovereignty over the area continuously during a time sufficient to create a usage and have done so under the general toleration" of the community of nations. *Id.*, at 102 (citing Juridical Regime of Historic Waters, Including Historic Bays 56, U. N. Doc. A/CN.4/143 (1962)) (internal quotation marks omitted). Accordingly, where a State within the United States wishes to claim submerged lands based on an area's status as historic inland waters, the State must demonstrate that the United States: (1) exercises authority over the area; (2) has done so continuously; and (3) has done so with the acquiescence of foreign nations. See *Alabama and Mississippi Boundary Case, supra,* at 101–102.

Recognizing these strict evidentiary requirements, Alaska does not contend that the waters of Stefansson Sound are historic inland waters. Alaska does not purport to show any *specific* assertion by the United States that the waters of Stefansson Sound are inland waters. Rather, Alaska argues that, at the time it was admitted to the Union, the United States had a general, publicly stated policy of enclosing as

inland waters areas between the mainland and closely grouped fringing islands. If this general formula is applied to the Alaska's Arctic Coast, the State argues, the waters of Stefansson Sound qualify as inland waters. Alaska maintains that this policy was in effect from the early 1900's to 1971, when the United States published a set of charts strictly applying the arcs-of-circles method to Stefansson Sound. In Alaska's view, relying solely on the Convention's normal baseline approach to delimit the State's submerged lands impermissibly contracts the State's recognized territory from that which existed at the time of statehood.

Since adopting the Convention's definitions to give content to the Submerged Lands Act, we have never sustained a State's claim to submerged lands based solely on an assertion that the United States had adhered to a certain general boundary delimitation practice at the time of statehood. In the *Louisiana Boundary Case,* we left open the possibility that Louisiana could claim ownership of certain submerged lands by demonstrating a "firm and continuing international policy" of enclosing waters between the mainland and island fringes as "inland waters." 394 U. S., at 74, n. 97. Had that been the United States' "consistent official international stance," the Government "arguably could not abandon that stance solely to gain advantage in a lawsuit to the detriment of Louisiana." *Ibid.* In that litigation, the State ultimately failed to demonstrate any firm and continuing international policy of enclosing waters behind island fringes as inland waters. See *United States* v. *Louisiana,* 420 U. S. 529, 529–530 (1975) *(per curiam)* (decree) (accepting Master's recommendation that certain actions by the United States did not establish a general policy of applying straight baselines to near-fringing islands); Report of Special Master in *United States* v. *Louisiana,* O. T. 1974, No. 9 Orig., pp. 7–13. Alaska nevertheless claims that in the *Alabama and Mississippi Boundary Case* the Court identified a "firm and continuing" 10-mile rule for fringing islands. Alaska first contends that

the *Alabama and Mississippi Boundary Case* precludes the Government from claiming that the waters of Stefansson Sound are not inland waters. The State then argues in the alternative that independent evidence supports its formulation of the rule. We address Alaska's points in turn.

B

In the *Alabama and Mississippi Boundary Case,* the Court considered the States' claim that the waters of Mississippi Sound constituted "historic" inland waters under Article 7(6) of the Convention. In discussing whether the States had shown that the United States had continuously asserted the inland water status of Mississippi Sound, the Court identified a general policy "of enclosing as inland waters those areas between the mainland and off-lying islands that were so closely grouped that no entrance exceeded 10 geographical miles." 470 U. S., at 106.

Alaska argues that the Government is estopped from questioning application of this general coastline delimitation practice to its Arctic Coast. Alaska recognizes the rule that the doctrine of nonmutual collateral estoppel is generally unavailable in litigation against the United States, see *United States* v. *Mendoza,* 464 U. S. 154, 160–163 (1984), but suggests that the policy considerations underlying this rule do not apply to cases arising under the Court's original jurisdiction, where the Court acts as factfinder and the United States has an incentive to fully litigate all essential issues.

We have not had occasion to consider application of nonmutual collateral estoppel in an original jurisdiction case, and we see no reason to develop an exception to *Mendoza* here. Even if the doctrine applied against the Government in an original jurisdiction case, it could only preclude relitigation of issues of fact or law *necessary* to a court's judgment. *Montana* v. *United States,* 440 U. S. 147, 153 (1979); *Mendoza, supra,* at 158. A careful reading of the *Alabama and Mississippi Boundary Case* makes clear that the Court did

not attach controlling legal significance to any general delimitation formula.

The Master in that case recited a series of statements and precedents following Mississippi's admission to the Union supporting the view that the Federal Government had treated the waters of Mississippi Sound as inland waters. These statements included multiple references to a rule for closing gulfs, bays, and estuaries with mouths less than 10 miles wide as inland waters, Report of Special Master in *Alabama and Mississippi Boundary Case*, O. T. 1983, No. 9 Orig., pp. 40, 42, 48–49, 52, and to a rule for closing straits leading to inland waters, *id.*, at 42, 49–50. In addition, the Master cited a 1961 letter from the Solicitor General to the Director of the United States Coast and Geodetic Survey concerning coastline delimitation principles for the Gulf of Mexico, proposing to treat "'[w]aters enclosed between the mainland and offlying islands . . . so closely grouped that no entrance exceeds ten miles'" as inland waters. *Id.*, at 52.

In excepting to the Master's conclusion that the waters of Mississippi Sound qualified as historic inland waters, the United States argued that the "generalized . . . formulations" recited by the Master could not support the States' claim, without evidence of *specific* federal claims to inland waters status for Mississippi Sound. Exceptions of United States in *Alabama and Mississippi Boundary Case*, O. T. 1983, No. 9 Orig., pp. 32–33. The Court assumed that the United States' position was correct, but concluded that the States had in fact identified "specific assertions of the status of [Mississippi] Sound as inland waters." 470 U. S., at 107; see *id.*, at 108–110.

In light of the Court's assumption that specific assertions of dominion would be critical to the States' historic title claim, we cannot conclude that any general delimitation policy identified in the *Alabama and Mississippi Boundary Case* is controlling here. The Court's inquiry in the *Alabama and Mississippi Boundary Case* was not whether the

States had demonstrated a "firm and continuing international policy" of enclosing waters between the mainland and island fringes as inland waters, sufficiently well defined to cover the waters of Mississippi Sound. Rather, the inquiry was whether the States had demonstrated that the Sound met the specific requirements for a historic inland waters claim under Article 7(6) of the Convention. In the context of that claim, the variation or imprecision in the United States' general boundary delimitation principles might have been irrelevant because the State could point to specific federal assertions that Mississippi Sound consisted of inland waters. But variation and imprecision in general boundary delimitation principles become relevant where, as here, a State relies solely on such principles for its claim that certain waters were inland waters at statehood. The United States is therefore free to argue that any 10-mile rule is not sufficiently well defined to support Alaska's claim that the waters of Stefansson Sound constitute inland waters.

## C

Alaska argues that even if principles of collateral estoppel do not apply, the evidence before the Master established that the United States had a well-defined, "firm and continuing" 10-mile rule that would require treating certain areas along Alaska's Arctic Coast as inland waters. The Master exhaustively cataloged documents and statements reflecting the United States' views and practices on boundary delimitation, both in its international relations and in disputes with various States, between 1903 and 1971. The Master found that "the exact nature of the United States' historic practice is a matter of some intricacy," and concluded that any 10-mile rule was not sufficiently well defined to require treating the waters of Stefansson Sound as inland waters. Report 55. Alaska argues that the Master afforded "undue significance to minor variations in the way the United States expressed its otherwise consistent policy over time, ignoring the prin-

ciple that minor uncertainties and even contradictions in a nation's practice are legally insignificant." Exceptions of State of Alaska 14 (Alaska Exceptions Brief). The relevant sources do not bear out Alaska's claim.

Of particular importance for our analysis is the position of the United States in its foreign relations between 1930 and 1949. In March 1930, the United States formally proposed certain principles for delimiting inland waters to the League of Nations Conference for the Codification of International Law. See 3 Acts of the Conference for the Codification of International Law, Territorial Waters 195–201 (1930) (Acts of the Conference). As the Geographer of the Department of State later observed, where the mainland and offshore islands are assigned individual 3-mile belts of territorial sea, there will remain "small pockets of the high sea deeply indenting territorial waters." U. S. Exh. 85–223 (Boggs, Delimitation of the Territorial Sea, 24 Am. J. Int'l L. 541, 552 (1930)). Because such pockets would "constitute no useful portion of the high sea from the viewpoint of navigation," *ibid.*, the United States proposed that countries "assimilate" these small enclaves of high seas to the adjacent territorial sea where a single straight line of no more than four nautical miles in length would enclose an enclave, 3 Acts of the Conference 201. At the same Conference, the United States also proposed a rule for straits. Where a strait connected "two seas having the character of high seas," the waters of the strait would be considered territorial waters of the coastal nation, as long as both entrances of the strait were less than six nautical miles wide. *Id.*, at 200. Where a strait was "merely a channel of communication with an inland sea," rules regarding closing of bays would apply. *Id.*, at 201. Under those rules, waters shoreward of closing lines less than 10 nautical miles in length would be treated as "inland" waters. *Id.*, at 198.

The United States' 1930 "assimilation" proposal is inconsistent with Alaska's assertion that, since the early 1900's,

the United States had followed a firm and continuing 10-mile rule for fringing islands. If the United States' policy had been to draw a baseline connecting islands no more than 10 miles apart, all waters between that line and the mainland would have been treated as "inland waters." Under the 1930 formula, however, there were "small pockets of the high sea" between that line and the mainland, and those pockets would have been assimilated to territorial waters (that is, waters seaward of the coastline), not to inland waters (that is, waters enclosed by the coastline). Alaska now argues that the 1930 assimilation proposal "was at most one of the legally insignificant uncertainties or contradictions" rather than a change from a firm 10-mile rule. Alaska Exceptions Brief 25 (internal quotation marks omitted). Alaska took a different position before the Special Master, where it argued that the United States "unequivocally embraced the 'assimilation' practice as the official United States position" between 1930 and 1949. Brief for Alaska on Island Fringes 54, 60–61; see Alaska Exh. 85–63 (Memorandum of United States in Response to Request of Special Master in *United States* v. *California*, O. T. 1949, No. 11 Orig., p. 19); Alaska Exh. 85–82 (Aide-Mémoire from the Department of State to the Government of Norway, Sept. 29, 1949, pp. 4–5). Alaska cannot explain why the United States would have pointed to the assimilation formula as its official position between 1930 and 1949 if a 10-mile rule for islands was in effect during that time.

Nor does the United States' proposal on straits demonstrate a policy of connecting near-fringing islands with straight baselines of less than 10 miles. If the mainland and offshore islands form the two coasts of a strait, under the United States' proposal the strait would be treated as territorial waters (not inland waters) if it linked two areas of high seas. The distance between the fringing islands may have some bearing on whether those islands in fact form the coast of a strait, but not on whether the waters they enclose are

territorial or inland waters. In other words, under the 1930 proposal, the character of the waters to which a strait leads, not the distance between the islands forming one coast of the strait, determines the character of the strait itself.

Rather than treating the mainland and a line connecting fringing islands as the two coasts of a strait, Alaska appears to view a passageway between two offshore islands, leading to the waters between the islands and the mainland, as a strait. With this geographic configuration in mind, Alaska argues that the proposal to apply a 10-mile bay-closing rule to a strait serving as a "channel of communication with an inland sea" is "fully consistent" with a 10-mile rule. Alaska Exceptions Brief 25. But even under this approach, a rule that straits leading to an inland sea are themselves inland waters is not equivalent to a simple 10-mile rule. Again, under the United States' 1930 proposal, the character of the strait depends on the character of the waters to which it leads. A 10-mile bay-closing rule would apply only if the waters between the strait and the mainland were inland waters under some other principle. Under the simple 10-mile rule that Alaska advocates, the fact that the islands are less than 10 miles apart itself determines that the waters behind the islands are inland waters.

In sum, although Alaska is correct that the United States' position at the League of Nations Conference did not call for strict application of the arcs-of-circles method, *ibid.*, neither the assimilation proposal nor the proposal for straits is fully consistent with a simple rule that islands less than 10 miles apart enclose inland waters.

The discussion above leads to the conclusion that, if the United States had a 10-mile rule at Alaska's statehood, that rule developed after 1949. Even if a rule developed within a decade of Alaska's statehood could be considered a "firm and continuing" one, Alaska has not shown that any such rule would encompass the islands off its Arctic Coast. For the period between 1950 and Alaska's statehood, Alaska fo-

cuses principally on the United States' position in a series of disputes with States over ownership of submerged lands in the vicinity of near-fringing islands, rather than on positions taken in its international relations. First, in 1950, the State Department and the Justice Department proposed a boundary between Louisiana's inland and territorial waters for use in the *Louisiana Boundary Case*. That boundary, known as the Chapman Line, followed certain barrier islands along Louisiana's southeast coast, enclosing Chandeleur and Breton Sounds and Calliou Bay as inland waters. According to Alaska, the Chapman Line shows the use of a simple 10-mile rule. Second, in 1951, the Justice Department asked the State Department to outline the United States' approach to demarcating inland and territorial waters, for purposes of submerged lands litigation between the United States and California. A letter from the Acting Secretary of State stated that an island "was to be surrounded by its own belt of territorial waters measured in the same manner as in the case of the mainland." Alaska Exh. 85–94 (Letter from James E. Webb to J. Howard McGrath, Attorney General, Nov. 13, 1951, p. 3). The letter also drew upon the 1930 Hague proposals for straits, noting that the waters of a strait connecting high seas were never inland waters, but that bay-closing rules should apply to a strait serving as "a channel of communication to an inland sea." *Id.*, at 4. Third, in a submission to the Court in 1958, the United States commented that waters behind certain islands in Louisiana, Mississippi, and Alabama were inland waters. Brief for United States in Support of Motion for Judgment on Amended Complaint in *United States* v. *Louisiana*, O. T. 1958, No. 9 Orig., pp. 177, 254, 261.

We agree with the Special Master that the United States did not exclusively employ a simple 10-mile rule in its disputes with the Gulf States and with California. The 1951 State Department letter in the *California* litigation merely echoed the United States' proposal at the Hague Conference

concerning straits leading to inland waters. As discussed *supra*, at 18–19, a rule applying 10-mile bay-closing principles to straits leading to inland waters would not always lead to the same result as a simple 10-mile rule. Under the former approach, the critical factor is where the strait leads, not the width of the strait. Alaska does not attempt to show that Stefansson Sound is a strait leading to inland waters.

Nor does the 1950 Chapman Line reflect a "firm and continuing" policy of enclosing waters behind fringing islands as "inland waters." The Chapman Line may be consistent with such a policy, but as the Master noted, no contemporaneous document explains the theory behind the Chapman Line in terms of a simple 10-mile rule. Report 85–88. Indeed, a 1950 draft memorandum from the State Department Geographer to the Justice Department opined that Chandeleur and Breton Sounds should be treated as inland waters not only because they were screened by a chain of islands that were less than 10 miles apart, but also because they were "not extensively traversed by foreign vessels" and because the islands covered "more than half the total arc of the territorial sea." U. S. Exh. 85–400. These criteria go far beyond the simple 10-mile rule, and Alaska does not show how they would apply to Stefansson Sound. Finally, statements in the briefs filed by the United States in litigation with the Gulf States that certain waters behind offshore islands were inland waters do not explicitly rely on a 10-mile rule. Moreover, in our decision in *United States* v. *Louisiana*, 363 U. S. 1, 67, n. 108 (1960), we made clear that we did not take the Government's concession that certain islands off Louisiana's shore enclosed inland waters "to settle the location of the coastline of Louisiana or that of any other State."

These and other documents considered by the Master support his conclusion that Alaska has not identified a firm and continuing 10-mile rule that would clearly require treating the waters of Stefansson Sound as inland waters at the time

of Alaska's statehood. Indeed, we note that the result Alaska seeks would be in tension with the outcome of the *Massachusetts Boundary Case*, 475 U. S. 89 (1986), where, a year after deciding the *Alabama and Mississippi Boundary Case*, we concluded that the waters of Nantucket Sound are not inland waters. Following the Court's decision in the *Alabama and Mississippi Boundary Case*, Massachusetts argued that a 10-mile rule would make the waters of Nantucket Sound inland waters. The Master in that case recognized that no entrance between the islands enclosing Nantucket Sound exceeded 10 miles, but nevertheless concluded that Massachusetts had not shown that the waters of Nantucket Sound were inland waters. Report of Special Master in *Massachusetts Boundary Case*, O. T. 1984, No. 35 Orig., pp. 69.2–70. We rejected the Commonwealth's claim to inland waters status for Nantucket Sound, framed in its exception to the Master's recommendation as an "ancient title" claim. *Massachusetts Boundary Case, supra*, at 105. If the case could have been resolved by reference to a simple 10-mile rule for all fringing islands, we need not have entertained such a claim.

## D

In sum, we conclude that Alaska's entitlement to submerged lands along its Arctic Coast must be determined by applying the Convention's normal baseline principles. The *Alabama and Mississippi Boundary Case* does not foreclose this conclusion. The sources before the Master showed that, in its foreign relations, particularly in the period 1930 to 1949, the United States had advocated a rule under which objectionable pockets of high seas would be assimilated to a coastal nation's territorial sea. Such a rule would have been inconsistent with the maintenance of a 10-mile rule for fringing islands. The United States also advocated a rule for treating the waters of a strait leading to an inland sea as inland waters, but that rule is not equivalent to Alaska's simple 10-mile rule. Whether the waters of Stefansson Sound

would be considered inland waters under the 1930 proposal for straits is unclear.

Accordingly, we overrule Alaska's first exception.

### III

Alaska next excepts to the Master's conclusion that a small gravel and ice formation in the Flaxman Island chain, known as Dinkum Sands, is not an island. Whether Dinkum Sands is an island affects Alaska's ownership of offshore submerged lands in the feature's vicinity.

As discussed above, a State's coastline provides the starting point for measuring its 3-mile Submerged Lands Act grant. See 43 U. S. C. §§ 1301(a)(2), 1311(a). Generally, the State's coastline corresponds to a "baseline" from which, under the 1958 Convention, the United States measures its territorial sea for international purposes. *Supra,* at 8. Article 10(1) of the Convention defines an island as "a naturally-formed area of land, surrounded by water, which is above water at high-tide." A line of ordinary low water along the coast of an island can serve as a baseline for measuring the territorial sea. See Arts. 10(2), 3. The Convention also permits a nation to claim a belt of territorial sea around certain features that are not above water at high tide, so long as they are located wholly or partly within the territorial sea belt of the mainland or an island. Arts. 11(1)–(2). Again, for purposes of determining a State's ownership rights under the Submerged Lands Act, we are concerned with a 3-mile belt of the territorial sea. See *supra,* at 8–9. Because Dinkum Sands is not within three miles of the nearest islands or the mainland, it does not meet the requirements of Article 11. Accordingly, Dinkum Sands has its own belt of territorial sea—and Alaska owns submerged lands beneath that belt—only if Dinkum Sands satisfies the requirements of Article 10(1).

The issue here has been narrowed to whether Dinkum Sands is "above water at high-tide." Dinkum Sands has fre-

quently been submerged. Apart from daily shifts in the tide and seasonal shifts in sea level, the feature itself changes height. Report 275, 280–283, 309, n. 66. This phenomenon may be at least in part attributable to what the United States' expert witness termed "ice collapse." Dinkum Sands is formed by layers of ice and gravel mixed with ice. As the summer months approach, ice within Dinkum Sands melts and the feature slumps in elevation. 7 Tr. 986–987, 8 Tr. 1060–1062 (July 23, 1984).

Alaska and the United States agree that "high-tide" under Article 10(1) should be defined as "mean high water," an average measure of high water over a 19-year period. Cf. *United States* v. *California,* 382 U. S. 448, 449–450 (1966) *(per curiam)* (entering decree defining an island as "above the level of mean high water" and defining mean high water as "the average elevation of all the high tides occurring over a period of 18.6 years"); *Borax Consol., Ltd.* v. *Los Angeles,* 296 U. S. 10, 26–27 (1935) (approving definition of "mean high tide line" based on "average height of all the high waters . . . over a considerable period of time," at least 18.6 years). They disagree over how frequently a feature of variable elevation such as Dinkum Sands must be above mean high water to qualify as an island. Based on the drafting history of Article 10, the Master concluded that an island must "generally," "normally," or "usually" be above mean high water. Report 302. Applying this standard, the Master reviewed historical hydrographic and cartographic evidence and the results of a joint monitoring project conducted by the parties in 1981 and 1982. He concluded that Dinkum Sands is frequently below mean high water and therefore is not an island. *Id.,* at 310.

Alaska excepts to this conclusion on three grounds. First, Alaska challenges the legal conclusion that Article 10(1) requires an island to be above mean high water at least "generally," "normally," or "usually." Second, Alaska disputes the Master's factual finding that Dinkum Sands is fre-

quently below mean high water. Finally, Alaska argues that Dinkum Sands should be treated as an island when it is in fact above mean high water. We find no error in the Master's conclusion.

A

In the proceedings before the Master, the United States took the position that an island must be "permanently" above mean high water, Brief for United States on Dinkum Sands 17–29, while Alaska argued that Article 10 permits a feature "to slump on occasion below" mean high water but still qualify as an island, Brief for Alaska on Dinkum Sands 64. The Master essentially rejected the United States' position in favor of a somewhat more lenient standard, under which an island must "generally," "normally," or "usually" be above mean high water. Although Alaska now objects to this standard, Alaska Exceptions Brief 44–45, 51, it sets forth no clear alternative. Alaska's observation that "an island that is occasionally submerged is no less an island," id., at 45, is not inconsistent with the Master's approach.

If Alaska is now implicitly claiming that a feature need appear only episodically above mean high water to qualify as an island, its position is without merit. Because Article 10(1) does not specify how frequently a feature must be above mean high water to qualify as an island, we must look to the Convention's drafting history for guidance. See *Louisiana Boundary Case*, 394 U. S., at 42–47. In urging that the Master's interpretation of Article 10(1) is inconsistent with the development of that provision, Alaska focuses on the fact that earlier drafts specified that an island must be "permanently above high-water mark." Report 297 (citing J. François, Report on the Régime of the Territorial Sea, [1952] 2 Y. B. Int'l L. Comm'n 25, 36, U. N. Doc. A/CN.4/53 (in French; translation from Alaska Exh. 84A–21, p. 41)); see Alaska Exceptions Brief 50. The eventual deletion of the modifier "permanently," in Alaska's view, suggests that Arti-

cle 10(1) contains no implicit modifier at all, such as "generally," "normally," or "usually."

Alaska's reading of Article 10(1)'s drafting history is selective. In fact, the drafting history supports a standard at least as stringent as that adopted by the Master. The provision was first introduced at the League of Nations Conference for the Codification of International Law, held at The Hague in 1930. A preparatory committee offered the following as a basis for discussion: "In order that an island may have its own territorial waters, it is necessary that it should be permanently above the level of high tide." 2 Conference for the Codification of International Law, Bases of Discussion, Territorial Waters 54 (1929). A subcommittee revised the definition but retained the element of permanence: "An island is an area of land, surrounded by water, which is permanently above high-water mark." 3 Acts of the Conference 219. When the International Law Commission of the United Nations revived the work of the Conference in 1951, a special rapporteur reintroduced the subcommittee's definition. Report 297.

In 1954, the British delegate proposed adding the modifier "in normal circumstances," so that an island's status would not be questioned because it was temporarily submerged at high tide in an "exceptional cas[e]." See Summary Records of the 260th Meeting, [1954] 1 Y. B. Int'l L. Comm'n 92. The Commission adopted that proposal, id., at 94, and in its final report defined an island as "an area of land, surrounded by water, which in normal circumstances is permanently above high-water mark," Report of the International Law Commission to the General Assembly, Art. 10, U. N. Gen. Ass. Off. Rec., 11th Sess., Supp. No. 9, U. N. Doc. A/3159, p. 16 (1956).

In 1957, an internal State Department memorandum evaluating the Commission's work suggested that the words "permanently" and "in normal circumstances" appeared to be inconsistent and could both be omitted, because "current

international law does not purport to solve such minor prob-
lems" as how to treat formations that would be submerged
at unusually high states of high tide.   Alaska Exh. 84A–21
(Memorandum from Benjamin H. Read, Islands, Drying
Rocks and Drying Shoals, Sept. 1957, p. 11).   The United
States presented that position at the 1958 United Nations
Conference on the Law of the Sea, arguing that "there is no
established state practice regarding the effect of subnormal
or abnormal or seasonal tidal action on the status of islands."
3 United Nations Conference on the Law of the Sea, Official
Records: First Committee (Territorial Sea and Contiguous
Zone), Summary Records of Meetings and Annexes, U. N.
Doc. A/CONF.13/C1./L.112, p. 242 (1958).   The Conference
adopted the United States' recommendation, and excised the
words "permanently" and "in normal circumstances" from
the definition of an island.

As the Master recognized, in including the phrase "in nor-
mal circumstances," the Convention's drafters had sought to
accommodate abnormal events that would cause temporary
inundation of a feature otherwise qualifying as an island.
Report 300.   The United States' view that the international
definition of an island need not address abnormal or seasonal
tidal activity ultimately prevailed.   But the change from the
Commission's draft to the final language of the Convention
did not signal an intent to cover features that are only some-
times or occasionally above high tide.   In fact, the problem
of abnormal or seasonal tidal activity that the 1954 amend-
ment addressed is fully solved by the United States' practice
of construing "high tide" to mean "mean high water."   Aver-
aging high waters over a 19-year period accounts for periodic
variations attributable to astronomic forces; nonperiodic, me-
teorological variations can be assumed to balance out over
this length of time.   See 2 A. Shalowitz, Shore and Sea
Boundaries 58–59 (1964).   Accordingly, even if a feature
would be submerged at the highest monthly tides during a
particular season or in unusual weather, the feature might

still be above "mean high water" and therefore qualify as an island.

What Alaska seeks is insular status not for a feature that is submerged at abnormally high states of tide, but for a feature that rises above and falls below *mean* high water— a tidal datum that has already accounted for the tidal abnormalities about which the drafters of Article 10(1) were concerned. Even if Article 10(1)'s drafting history could support insular status for a feature that slumps below mean high water because of an *abnormal* change in elevation, it does not support insular status for a feature that exhibits a pattern of slumping below mean high water because of *seasonal* changes in elevation. Alaska nevertheless contends that there is support for according island status to features more "ephemera[l]" than Dinkum Sands. See Alaska Exceptions Brief 45–50. The authorities Alaska cites all predate the Convention and are therefore unhelpful in construing Article 10(1). Alaska also relies on an analogy to the "mudlumps" of the Mississippi delta, features whose status under the Convention has never been determined. See Report of Special Master in *United States* v. *Louisiana,* O. T. 1974, No. 9 Orig., p. 4 (filed July 31, 1974) (concluding that Louisiana's Submerged Lands Act grant could be measured from two mudlumps, but not deciding whether the mudlumps were islands under Article 10(1) or low-tide elevations under Article 11(1)); *United States* v. *Louisiana,* 420 U. S. 529 (1975) (overruling exceptions).

In sum, the Convention's drafting history suggests that, to qualify as an island, a feature must be above high water except in abnormal circumstances. Alaska identifies no basis for according insular status to a feature that is frequently below mean high water.

B

In disputing the Master's factual conclusion that Dinkum Sands is "frequently below mean high water," Report 39, Alaska relies on three cartographic sources. First, two nau-

tical charts produced following a 1949–1950 survey of the Beaufort Sea by a United States Coast and Geodetic Survey party depict Dinkum Sands as an island, consistent with a survey note describing a "new gravel bar baring about three feet" at mean high water. Alaska Exh. 84A–203 (U. S. Coast and Geodetic Survey, Descriptive Report to Accompany Hydrographic Survey H–7761, p. 3); see Alaska Exh. 84A–202 (U. S. Coast and Geodetic Survey, Addendum to Descriptive Report to Accompany Hydrographic Survey H–7760, p. 4). Second, in 1971, an ad hoc interagency group known as the Baseline Committee, charged with delimiting the United States' coastline, produced baseline charts treating Dinkum Sands as an island. Third, a 1979 map developed for a joint federal-state oil and gas lease sale in the Prudhoe Bay area assigned ownership of a 3-mile belt of territorial sea around Dinkum Sands to Alaska.

As Alaska appears to acknowledge, see Alaska Exceptions Brief 53, the 1971 baseline chart and the 1979 leasing map were based on the 1949–1950 survey rather than independent observations. In 1956, the United States Coast and Geodetic Survey resumed charting Dinkum Sands as a low-tide elevation, based on observations of a Navy vessel made the prior year. It is undisputed that one of the members of the Baseline Committee persuaded the Committee to treat Dinkum Sands as an island based solely on his personal observation of Dinkum Sands as a member of the 1949–1950 survey party. See Alaska Exh. 84A–207 (Department of State, Memorandum to Members of the Baseline Committee, Minutes of Oct. 10, 1979, Meeting, p. 2) (noting that the Committee "has used Dinkum Sands as a basepoint for determining the breadth of the territorial sea . . . because early surveys showed Dinkum Sands to be above high water and Admiral Nygren had personally observed it above high water"). The 1979 leasing map relied on the 1971 baseline chart in assigning Dinkum Sands its own 3-mile belt of territorial sea.

The question, then, is whether the 1949–1950 survey party's conclusion that Dinkum Sands is three feet above mean high water, taken together with visual observations of Dinkum Sands above water, undermines the Master's factual finding that Dinkum Sands is "frequently below mean high water." Report 309. It does not.

Alaska emphasizes that Dinkum Sands has been observed "many times . . . above water" and only "occasionally . . . submerged." Alaska Exceptions Brief 44. But visual observations of Dinkum Sands are not dispositive; the question is not whether Dinkum Sands is above or below high tide on any given day, but where the feature lies in relation to *mean* high water. To address precisely this problem, the parties jointly commissioned a $2.5 million study to calculate mean high water in the feature's vicinity and to determine the feature's elevation in relation to that datum. First, using a year of tidal readings, the National Ocean Survey computed a mean high-water datum at Dinkum Sands and calculated an error band to account for the fact that the level would ordinarily be based on 19 years of readings. Second, an engineering firm measured Dinkum Sands' highest points in March, June, and August 1981.

Comparing the feature's highest elevation measurements to the mean high-water level, the Master found that Dinkum Sands was not above mean high water at any time it was surveyed. The two highest points of the survey were within the error band for the mean high-water level, but the Master found this fact to be of little weight because the measurements were likely taken from piles of gravel disturbed by the March measurements, rather than from Dinkum Sands' true highest points. Alaska continued to measure Dinkum Sands in relation to mean high water in 1982 and 1983. The feature was found to be above mean high water on a visit in July 1982. By September, the feature had fallen in elevation, possibly by more than a foot, see Report 281–282, placing it below the mean high-water datum.

Between May and July 1983, the feature was observed above water several times, although its elevation in relation to mean high water was not known. Based on two helicopter observations of the feature and estimates of sea level in relation to mean high water, the Master concluded that Dinkum Sands could have been above high water by a matter of inches in September 1983. The Master found that the feature was "consistently" below mean high water in 1981 and below mean high water by September—the end of the open water season—in both 1981 and 1982. *Id.*, at 309. Relying largely on the 1981–1983 data, the Master concluded that Dinkum Sands is not an island.

Alaska makes no mention of the 1981 joint monitoring project. The Master discussed the State's methodological objections to the results at length, see *id.*, at 255–269, and we see no reason to revisit the Master's conclusion that those objections are unpersuasive. Alaska does not explain why the Master should have relied on a single August 1949 measurement of Dinkum Sands' elevation in relation to mean high water rather than on the exhaustive survey expressly designed to determine Dinkum Sands' status under Article 10(1) of the Convention. In contending that Dinkum Sands has been above mean high water except on a "handful of occasions," Alaska recognizes that Dinkum Sands slumps in elevation during the open water season between late July and September. Alaska Exceptions Brief 54. Alaska suggests that natural processes build up Dinkum Sands "just . . . prior to the autumn freeze-up," and that the feature then remains above mean high water for 9 to 10 months of the year. See *ibid.* There is no basis in the record, however, for concluding that Dinkum Sands is above mean high water during the winter months. During the winter, the area is completely covered by pack ice. The sole measurement of the feature's elevation during the winter was that taken in March 1981, and it was then below mean high water. Report 286. But even if the record demonstrated that the

feature remained above mean high water until "ice collapse" caused it to slump, that would not compel a ruling in Alaska's favor. Although Article 10(1)'s drafting history may suggest that a feature submerged at abnormally high tides does not lose its insular status, it does not support the broader conclusion that a feature with a *seasonal* loss in elevation, bringing it below mean high water, qualifies as an island. See *supra*, at 27.

In sum, we find no error in the Master's conclusion that Dinkum Sands is frequently below mean high water and therefore does not meet the standard for an island.

## C

Alaska finally urges a compromise resolution, under which Dinkum Sands would be deemed an island when above mean high water. Alaska attempts to find support for its position in this Court's recognition in prior cases of the concept of an "ambulatory coast line." Alaska Exceptions Brief 55. In adopting the 1958 Convention to aid interpretation of the Submerged Lands Act, we recognized that the Convention treats a nation's coastline as its modern, ambulatory coastline. See *United States* v. *Louisiana*, 394 U. S. 1, 5 (1969) *(Texas Boundary Case); Louisiana Boundary Case*, 394 U. S., at 32–34. Shifts in a low-water line along the shore, we acknowledged, could lead to a shift in the baseline for measuring a maritime zone for international purposes. In turn, the State's entitlement to submerged lands beneath the territorial sea would change.

An island may very well have its *own* ambulatory coastline. What Alaska seeks here, however, is not an entitlement to submerged lands seaward of a gradually accreting or eroding shore. Rather, Alaska's ownership of submerged lands around Dinkum Sands would appear and disappear periodically, depending upon whether the feature was above or below mean high water. Not only does Article 10(1) of the Convention not support such a reading, but Alaska's position

32

makes a sensible application of other provisions of the Convention impossible. The Convention separately categorizes features that are below mean high water, but above water at low tide. See Art. 11. In addition, under Articles 10(2) and 3, an island's belt of territorial sea is measured from the line of low water. As Dinkum Sands' elevation shifts and the feature slumps toward the mean high-water datum, below the mean high-water datum, and possibly below the low-water datum, the baseline for measuring the surrounding maritime zone would shift and then disappear. Quite apart from the fact that Alaska's proposal would lead to costly and time-consuming monitoring efforts, we agree with the Master that Alaska has identified no precedent for treating as an island a feature that oscillates above and below mean high water.

## IV

Alaska's third exception concerns the ownership of submerged lands within the National Petroleum Reserve-Alaska (Reserve), a 23-million acre federal reservation in the northwestern part of the State. The Reserve's seaward boundary runs along the Arctic Ocean from Icy Cape at the west to the mouth of the Colville River at the east. When this litigation began, Alaska and the United States disputed the location of the Reserve's boundary, focusing in particular on whether the boundary followed the sinuosities of the coast or instead cut across certain inlets, bays, and river estuaries. Alaska initially conceded federal ownership of submerged lands within that boundary. In light of this Court's decision in Montana v. United States, 450 U. S. 544 (1981), and with the consent of the United States, the Special Master granted Alaska relief from its concession, and Alaska claimed ownership of submerged lands beneath certain coastal features within the Reserve's boundaries. Order of Special Master in United States v. Alaska, O. T. 1983, No. 84 Orig. (Jan. 4, 1984). A separate proceeding concerning ownership of submerged lands beneath inland navigable waters is pending in

Federal District Court, *Alaska* v. *United States,* Nos. A83–343, A84–435, A86–191 (D. Alaska), and has been stayed until resolution of the present case, see Report 347, n. 4.

The parties no longer dispute the location of the Reserve's boundary. Accordingly, we consider only the Master's recommendation concerning the ownership of submerged lands beneath certain coastal features within that boundary. The Master concluded that the United States retained ownership of the submerged lands in question at Alaska's statehood. That conclusion rested principally on three premises: first, that the United States can prevent lands beneath navigable waters from passing to a State upon admission to the Union by reserving those lands in federal ownership (as opposed to conveying them to a third party); second, that Congress had authorized the President to reserve submerged lands with a 1910 statute known as the Pickett Act; and third, that the 1923 Executive Order creating the Reserve reflected a clear intent to reserve all submerged lands within the boundaries of the Reserve and to defeat the State's title to the submerged lands in question. Alaska excepts to the Master's conclusion on several grounds, arguing that the Government did not show a sufficiently clear intent to reserve submerged lands or to defeat state title and that the 1923 Executive Order was promulgated without proper authority. We discuss some background principles and then consider these arguments in turn.

A

The Property Clause, Art. IV, § 3, cl. 2, provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." In *Shively* v. *Bowlby,* 152 U. S. 1, 48 (1894), the Court concluded that this power extended to granting submerged lands to private parties, and thereby defeating a future State's equal footing title, "to carry out . . . public purposes appropriate to the objects for which the United States hold the Territory." We

agree with the Special Master that Congress can also reserve submerged lands under federal control for an appropriate public purpose, and thus resolve a question left open in *Utah Div. of State Lands*, 482 U. S., at 201, in the United States' favor.

As drawn by the Master, the boundary of the Reserve encompasses both those lands that would ordinarily pass to Alaska under the equal footing doctrine—that is, tidelands and submerged lands beneath inland navigable waters—and those lands that would pass to Alaska only by virtue of the Submerged Lands Act—that is, lands beneath the 3-mile territorial sea. As a result, the parties dispute the principles governing ownership of the submerged lands.

Under our equal footing cases, "[a] court deciding a question of title to the bed of navigable water must . . . begin with a strong presumption" against defeat of a State's title. *Montana, supra,* at 552; see *Utah Div. of State Lands, supra,* at 197–198. We will not infer an intent to defeat a future State's title to inland submerged lands "unless the intention was definitely declared or otherwise made very plain." *United States* v. *Holt State Bank,* 270 U. S. 49, 55 (1926). The United States argues that the presumption against defeat of state title does not apply to lands passing solely under the Submerged Lands Act—that is, lands beneath the territorial sea—over which the United States has paramount authority: Any grant of such lands is to be " 'construed strictly in favor of the United States.' " United States Opposition Brief 53 (quoting *California ex rel. State Lands Comm'n,* 457 U. S., at 287). The Master agreed with the Government's approach, concluding that the United States can demonstrate that it retained title to submerged lands beneath the territorial sea under a "less demanding standard" than our equal footing cases require. Report 394. Nevertheless, the Master analyzed the withdrawal under the "stricter" standards of *Utah Div. of State Lands* and *Montana,* reasoning that the less demanding test for lands be-

neath the territorial sea would be relevant only if the United States failed to satisfy the more stringent test. Report 394.

Neither the Submerged Lands Act itself nor our case law supports the United States' approach. The Submerged Lands Act grants States submerged lands beneath a 3-mile belt of the territorial sea. The statute is a grant of federal property, and the scope of that grant must be construed strictly in the United States' favor. But that principle does not permit us to ignore the statute's terms, which provide that a State receives title to submerged lands beneath the territorial sea unless the United States *"expressly* retain[s]" them. 43 U. S. C. § 1313(a) (emphasis added). We cannot resolve "doubts" about whether the United States has withheld state title to submerged lands beneath the territorial sea in the United States' favor, for doing so would require us to find an "express" retention of submerged lands where none exists. The Submerged Lands Act does not call into question cases holding that the United States has paramount sovereign authority over submerged lands beneath the territorial sea. See *California I,* 332 U. S., at 35–36; *United States* v. *Louisiana,* 339 U. S. 699, 704 (1950); *United States* v. *Texas,* 339 U. S. 707, 719 (1950). But Congress has chosen to exercise that authority by presumptively granting those lands to the States, unless the United States has "expressly retained" submerged lands.

Reinforcing this reading of the Act is the fact that the Act's terms reach lands governed by the equal footing doctrine as well as lands beneath the territorial sea. Under the terms of the statute, equal footing lands, like those beneath the territorial sea, pass to a State unless the United States "expressly retained" them. In passing the Act, Congress would have legislated against the backdrop of our early equal footing cases. See *Montana,* 450 U. S., at 552, n. 2. There is no indication that, in formulating the "expressly retained" standard, Congress intended to upset settled doctrine and to impose on the Federal Government a more or less demanding

standard than the one reflected in those cases, see, *e. g., Holt State Bank, supra,* at 55 (holding that intent to defeat state title to submerged lands must be "definitely declared or otherwise made very plain"), and carried forward in *Montana* and *Utah Div. of State Lands.* Whether title to submerged lands rests with a State, of course, is ultimately a matter of federal intent. In construing a single federal instrument creating a reserve, we see no reason to apply the phrase "expressly retained" differently depending upon whether the lands in question would pass to a State by virtue of a statutory grant or by virtue of the equal footing doctrine, as confirmed by statute.

Applying *Montana* and *Utah Div. of State Lands,* then, we must ask whether the United States intended to include submerged lands within the Reserve and to defeat Alaska's title to those lands.

B

1

President Harding created the National Petroleum Reserve by Executive Order in 1923. The order described a boundary following the Arctic "coast line," measured along "the ocean side of the sandspits and islands forming the barrier reefs and extending across small lagoons from point to point, where such barrier reefs are not over three miles off shore." Exec. Order No. 3797–A, in Presidential Executive Orders (1980) (microform, reel 6). Because the boundary follows the ocean side of the islands, the Reserve necessarily includes tidelands landward of the islands. The Reserve also contains coastal features, including "small lagoons" (to which the Order explicitly refers) and the mouths of rivers and bays (which the Master concluded were within the Reserve's boundary). Report 381. Alaska argues that the fact that the United States included certain water areas within the exterior boundaries of the Reserve does not necessarily mean that the United States clearly intended to re-

serve the submerged lands beneath those waters. Alaska Exceptions Brief 62. In support of this proposition, Alaska points primarily to our decisions in *Montana, supra,* at 554, and *Utah Div. of State Lands,* 482 U. S., at 202.

In *Montana,* the United States, as trustee for the Crow Tribe, sought a declaratory judgment that it owned the riverbed of the Big Horn River and had conveyed a beneficial interest in the submerged lands to the Tribe. The river was located inside the boundaries of the Crow Reservation established by treaty in 1868, but the treaty did not expressly refer to the riverbed. 450 U. S., at 548, 554. Applying the "strong presumption against conveyance by the United States" to defeat a State's title, *id.,* at 552, we concluded that the "mere fact that the bed of a navigable water lies within the boundaries described in the treaty does not make the riverbed part of the conveyed land, especially when there is no express reference to the riverbed that might overcome the presumption against its conveyance," *id.,* at 554. Even though creation of an Indian reservation could be an "appropriate public purpose" justifying a conveyance of submerged lands, a conveyance of submerged lands beneath the river would not have been necessary for the Government's purpose, because fishing was not important to the Crow Tribe's way of life. *Id.,* at 556.

In *Utah Div. of State Lands,* the Court found that the United States had not prevented the bed of Utah Lake from passing to Utah at statehood. The Sundry Appropriations Act of 1888, 25 Stat. 505, authorized the United States Geological Survey to select "sites for reservoirs and other hydraulic works necessary for the storage and utilization of water for irrigation and the prevention of floods and overflows." *Id.,* at 526. The Survey selected Utah Lake as a reservoir site. 482 U. S., at 199. In 1890, when Congress repealed the 1888 Act, it provided "that reservoir sites heretofore located or selected shall remain segregated and re-

served from entry or settlement as provided by [the 1888 Act]." Sundry Appropriations Act of 1890, 26 Stat. 391.

In concluding that the 1888 Act did not reflect a clear intent to include submerged lands within lands reserved for reservoir sites, the Court focused in part on the fact that the Act was motivated by concerns that settlers would claim lands suitable for reservoir sites or other reclamation efforts. 482 U. S., at 198, 203. These concerns of "monopolization and speculation" "had nothing to do with the beds of navigable rivers and lakes." *Id.*, at 203. Moreover, the Government's ability to control and develop navigable waters would not be impaired if the land beneath the navigable waters passed to the State. *Id.*, at 202; see also *Arizona* v. *California*, 373 U. S. 546, 597–598 (1963); *Arizona* v. *California*, 283 U. S. 423, 451–452, 457 (1931). We also considered whether certain references to the bed of Utah Lake in reports by the Geological Survey, coupled with the 1890 Act's requirement that selected sites remain segregated, accomplished a reservation of the lake bed. We concluded that the references to the lake bed in the Survey documents, when placed in proper context, did not indicate that the bed was included within the reservation. *Utah Div. of State Lands, supra*, at 206. Finally, we held that even if the 1888 or 1890 Acts reflected a clear intent to include submerged lands within a reservation, there was no evidence that the United States intended to defeat future States' entitlement to any land reserved. Again, our analysis focused on the fact that the transfer of title to the lake bed would not prevent the Government from developing a reservoir or water reclamation project at the lake. *Id.*, at 208.

*Montana* and *Utah Div. of State Lands* establish that the fact that navigable waters are within the boundaries of a conveyance or reservation does not in itself mean that submerged lands beneath those waters were conveyed or reserved. But Alaska's reliance on these cases is misplaced for two reasons. First, the Executive Order of 1923 does

not merely define a boundary that encloses *a body of navigable water.* Rather, in describing a boundary following the ocean side of offshore islands and reefs, the Order created a Reserve that necessarily embraced certain *submerged lands*—specifically, tidelands shoreward of the barrier islands.[1] Second, *Montana* and *Utah Div. of State Lands* establish that the *purpose* of a conveyance or reservation is a critical factor in determining federal intent. See also *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 87–89 (1918) (reservation of "body of lands" in southeastern Alaska for Metlakahtla Indians included adjacent waters and submerged lands, because fishing was necessary for Indians' subsistence). The Executive Order of 1923 sought to retain federal ownership of land containing oil deposits. The Order recited that "there are large seepages of petroleum along the Arctic Coast of Alaska and conditions favorable to the occurrence of valuable petroleum fields on the Arctic Coast," and described the goal of securing a supply of oil for the Navy as "at all times a matter of national concern." Petroleum resources exist in subsurface formations necessarily extending beneath submerged lands and uplands. The purpose of reserving in federal ownership all oil and gas deposits within the Reserve's boundaries would have been undermined if those deposits underlying lagoons and other tidally influenced waters had been excluded. It is simply

---

[1] In light of the fact that the Order necessarily encompasses tidelands, the partial dissent's conclusion that the United States owns *no* submerged lands within the Reserve is puzzling. The dissent suggests that the United States retains submerged lands only if the relevant instrument " 'in terms embraces the land under the waters.' " *Post,* at 66 (THOMAS, J., concurring in part and dissenting in part) (quoting *Packer* v. *Bird,* 137 U. S. 661, 672 (1891)). By its terms, the Executive Order of 1923 certainly embraces all tidelands landward of the barrier islands. Accordingly, even if the dissent were correct that a federal intent to retain submerged lands can never be inferred, no inference is required for the conclusion that, at the very least, the United States retained the tidelands within the Reserve.

not plausible that the United States sought to reserve only the upland portions of the area.

Alaska also argues that any inclusion of submerged lands within the Reserve was not supported by an appropriate public purpose. Specifically, Alaska claims that only a "public exigency" or "international duty" will support a reservation of submerged lands. In *Shively*, the Court recognized a general congressional policy of granting away land beneath navigable waters only "in case of some international duty or public exigency," 152 U. S., at 50. But that is a congressional policy, not a constitutional obligation. *Utah Div. of State Lands*, 482 U. S., at 197. The only constitutional limitation on a conveyance or reservation of submerged lands is that it serve an appropriate public purpose: The United States has the power to dispose of submerged lands in pre-statehood territories "'in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out *other public purposes appropriate to the objects* for which the United States hold the Territory.'" *Id.*, at 196–197 (emphasis added) (quoting *Shively*, *supra*, at 48). There is no question that, as the Master concluded, the inclusion of submerged lands within the Reserve fulfilled an appropriate public purpose—namely, securing an oil supply for the national defense.

In sum, the 1923 Executive Order creating the Reserve reflects a clear intent to include submerged lands within the Reserve. The boundary by its terms embraces certain coastal features, and the Master interpreted it to embrace others. In light of the purpose of the Reserve, it is simply not plausible that the Order was intended to exclude submerged lands, and thereby to forfeit ownership of valuable petroleum resources beneath those lands. The importance of submerged lands to the United States' goal of securing a supply of oil distinguishes this case from *Montana* and *Utah*

*Div. of State Lands,* where the disputed submerged lands were unnecessary for achieving the federal objectives.

## 2

Under *Utah Div. of State Lands,* we must ask not only whether the United States intended a reservation to include submerged lands, but also whether the United States intended to defeat a future State's title to those lands. The Master found that Congress expressed a clear intent to defeat state title in § 11(b) of the Alaska Statehood Act. Pub. L. 85–508, 72 Stat. 347. That section provides that the United States has the "power of exclusive legislation . . . as provided by [the Enclave Clause of the Constitution, Art. I, § 8, cl. 17,] over such tracts or parcels of land as, immediately prior to the admission of said State, are owned by the United States and held for military . . . purposes, including naval petroleum reserve numbered 4 [the National Petroleum Reserve]." The Master concluded that § 11(b), "in referring to the Reserve as 'owned by the United States,' clearly contemplate[d] continued federal ownership of the Reserve." Report 433.

Alaska argues that § 11(b)'s reference to exclusive federal legislative authority over the Reserve under the Enclave Clause says nothing about United States' *title* to submerged lands within the Reserve. Alaska suggests that the United States need not *own* all lands within a military area to exercise jurisdiction, and Congress "had no reason to defeat State title to submerged lands [since] it always retains plenary authority to regulate navigable waters for defense purposes." Alaska Exceptions Brief 64. Alaska thus attempts to align this case with *Utah Div. of State Lands,* where we found no clear intent to defeat state title to the bed of Utah Lake, in part because the United States need not have defeated state title to preserve its ability to develop a reservoir or water reclamation project at the lake. 482 U. S., at 208.

42

Alaska's argument fails for several reasons.   First, Alaska ignores the fact the Reserve was not created to preserve the United States' "authority to regulate navigable waters for defense purposes," but to preserve the Government's ability to extract petroleum resources.   Ownership may not be necessary for federal regulation of navigable waters, but it is necessary to prevent the Reserve's petroleum resources from being drained from beneath submerged lands.   Second, when the United States exercises its power of "exclusive legislation" under the Enclave Clause, it necessarily acquires title to the property.   See *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 141, 142 (1937) ("[The Enclave Clause] governs those cases where the United States *acquires* lands with the consent of the legislature of the State for the purposes there described" (emphasis added)); see also *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518, 527 (1938).   Third, Alaska's argument that § 11(b) of the Statehood Act says nothing about federal ownership of the Reserve ignores the fact that, on its face, § 11(b) states that the United States "owned" the Reserve.

As discussed *supra*, at 38–41, the Reserve included submerged lands.   Section 11(b) thus reflects a clear congressional statement that the United States owned and would continue to own submerged lands included within the Reserve.   The conclusion that Congress was aware when it passed the Alaska Statehood Act that the Reserve encompassed submerged lands is reinforced by other legislation, enacted just before Alaska's admission to the Union, granting certain offshore lands to the Territory of Alaska.   See Pub. L. 85–303, § 2(a), 71 Stat. 623.   Congress expressly exempted from that grant "all oil and gas deposits located in the *submerged lands* along the Arctic coast of naval petroleum reserve numbered 4 [the National Petroleum Reserve]." § 3(d) (emphasis added).   Moreover, in contrast to *Utah Div. of State Lands*, defeating state title to submerged lands was necessary to achieve the United States' objec-

tive—securing a supply of oil and gas that would necessarily exist beneath uplands and submerged lands. The transfer of submerged lands at statehood—and the loss of ownership rights to the oil deposits beneath those lands—would have thwarted that purpose.

## C

Alaska argues that even if the 1923 Executive Order purported to include submerged lands within the Reserve for an appropriate public purpose and even if § 11(b) reflects a clear intent to defeat state title to all lands within the Reserve, title still passed to Alaska because the President lacked the authority to include submerged lands within the Reserve. Alaska Exceptions Brief 58–60. The argument is based in part on *Utah Div. of State Lands*, where we referred to the authority of *Congress* to dispose of property under the Property Clause, Art. IV, § 3, cl. 2. Since *Utah Div. of State Lands* concerned congressional enactments, it discloses little about the circumstances under which action by the Executive will defeat a State's equal footing claim to submerged lands.

As authority for inclusion of submerged lands within the Reserve, the Master focused on the Act of June 25, 1910, ch. 421, 36 Stat. 847, also known as the Pickett Act. The Act stated:

> "[T]he President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." § 1, 36 Stat. 847 (repealed by the Federal Land Policy and Management Act of 1976, Pub. L. 94–579, § 704(a), 90 Stat. 2792).

The Pickett Act nowhere specifically mentions submerged lands, and Alaska therefore challenges the Master's conclusion that the Pickett Act gave the President the express authority to dispose of them. Its argument rests mainly on the proposition that the Pickett Act's reference to "withdraw[al]" of "public lands" cannot include submerged lands, because such lands are not subject to sale, settlement, or entry under the general land laws and therefore need not be "withdrawn." Cf. *Utah Div. of State Lands*, 482 U. S., at 203 (1888 Act stated that lands designated for reservoir sites were " 'reserved from sale as the property of the United States, and shall not be subject . . . to entry, settlement or occupation' "; rejecting claim that Act authorized inclusion of submerged lands in part because such lands were already exempt from sale, entry, or occupation); *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 284 (1894) ("[T]he general legislation of Congress in respect to public lands does not extend to tide lands"); *Shively*, 152 U. S., at 48 ("Congress has never undertaken by general laws to dispose of" land under navigable waters).

Assuming, *arguendo*, that Alaska's construction of the Pickett Act is correct, it does not control the outcome of this case. We conclude that Congress ratified the terms of the 1923 Executive Order in § 11(b) of the Statehood Act. Despite Alaska's protestations to the contrary, there would have been no barrier to Congress retaining a petroleum reserve, including submerged lands, at the point of Alaska's statehood, provided it satisfied *Utah Div. of State Lands'* requirements of demonstrating a clear intent to include submerged lands within the Reserve's scope and a clear intent to defeat Alaska's title. It follows that Congress could achieve the same result by explicitly recognizing, at the point of Alaska's statehood, an Executive reservation that clearly included submerged lands. Cf. *Utah Div. of State Lands*, *supra*, at 205–207 (examining United States' claim that references to the bed of Utah Lake made by the Geological

Survey in reserving Utah Lake, taken together with 1890 Act providing that reservoir sites selected by the Geological Survey "shall remain segregated and reserved from entry or settlement," signaled Congress' ratification of the reservation of the lake bed; rejecting claim on the ground that Congress was not on notice that the Geological Survey had reserved the bed of the lake); *Holden* v. *Joy*, 17 Wall. 211, 247 (1872) (rejecting Property Clause challenge to President's treaty with Cherokee Nation; although terms of treaty exceeded express delegation of authority by Congress to the President, Congress had "repeatedly recognized" the validity of the treaty by enacting appropriation statutes).  As discussed *supra*, at 38–41, the 1923 Executive Order reflected a clear intent to include submerged lands within the Reserve. That instrument placed Congress on notice that the President had construed his reservation authority to extend to submerged lands and had exercised that authority to set aside uplands and submerged lands in the Reserve to secure a source of oil for the Navy.  Congress acknowledged the United States' ownership of and jurisdiction over the Reserve in § 11(b) of the Statehood Act.  Accordingly, Congress ratified the inclusion of submerged lands within the Reserve, whether or not it had intended the President's reservation authority under the Pickett Act to extend to such lands.

## D

In sum, we conclude that the United States retained ownership of submerged lands beneath certain coastal features within the Reserve at Alaska's statehood.  Under the strict standards of *Utah Div. of State Lands*, the Executive Order of 1923 reflected a clear intent to include submerged lands within the Reserve.  In addition to the fact that the Order refers to coastal features and necessarily covers the tidelands, excluding submerged lands beneath the coastal features would have been inconsistent with the purpose of the Reserve—to secure a supply of oil that would necessarily

exist beneath both submerged lands and uplands. Section 11(b) of the Alaska Statehood Act, which noted that the United States owned the Reserve and which included a statement of exclusive legislative jurisdiction under the Enclave Clause, reflects Congress' intent to ratify the inclusion of submerged lands within the Reserve and to defeat the State's title to those lands.

V

The United States excepts to the Master's conclusion that submerged lands within a federal reservation in northeastern Alaska, now known as the Arctic National Wildlife Refuge, passed to Alaska upon its admission to the Union in 1959. In November 1957, the Department of the Interior's Bureau of Sport Fisheries and Wildlife submitted an application to the Secretary of the Interior for withdrawal of 8.9 million acres of land "to establish an Arctic Wildlife Range within all or such portion of the described lands as may be finally determined to be necessary for the preservation of the wildlife and wilderness resources of that region of northeastern Alaska." Alaska Exh. 81 (Application for Withdrawal by Public Land Order, p. 1). This application was still pending in July 1958, when Congress passed the Alaska Statehood Act, and in January 1959, when Alaska was formally admitted to the Union. On December 6, 1960, the Secretary of the Interior issued Public Land Order 2214, which "reserved" the area "for use of the United States Fish and Wildlife Service as the Arctic National Wildlife Range." 25 Fed. Reg. 12598. In 1980, Congress expanded the Range to include an additional 9.2 million acres and renamed it the Arctic National Wildlife Refuge. Pub. L. 96–487, §303(2)(A), 94 Stat. 2390.

Before the Master, the parties disputed whether the 1957 Bureau of Sport Fisheries and Wildlife application for withdrawal and creation of the Range—filed before but granted after Alaska's admission to the Union—could prevent title to submerged lands within the Range from passing to Alaska at

statehood. The Alaska Statehood Act transferred to Alaska certain real property used for the conservation and protection of wildlife, but withheld from the State "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife." Pub. L. 85–508, §6(e), 72 Stat. 341. Among other things, the United States argued that the lands within the Range, including coastal submerged lands, had been "set apart" by the combined effect of the application and a Department of the Interior regulation in force when the application was filed and when Congress passed the Alaska Statehood Act. That regulation provided that the filing of an application "shall temporarily segregate such lands from settlement, location, sale, selection, entry, lease, and other forms of disposal under the public land laws, including the mining and the mineral leasing laws, to the extent that the withdrawal or reservation applied for, if effected, would prevent such forms of disposal." 43 CFR §295.11(a) (Supp. 1958). Accordingly, under the United States' principal theory, the 1957 Bureau of Sport Fisheries and Wildlife application had the legal effect of segregating or "setting apart" all lands within the projected boundaries of the Range, including submerged lands, as a wildlife refuge. If this were so, §6(e) of the Alaska Statehood Act withheld such lands from Alaska at statehood.

The Special Master rejected this approach. He focused on the fact that §6(e) prevents transfer only of those lands "set apart *as* refuges or reservations for the protection of wildlife." (Emphasis added.) The Master concluded that, taken together, the 1957 application and the Department of the Interior regulation "caused land to be set apart *for the purpose of* a wildlife reservation," but found that the land "was not yet set apart *as* a refuge or reservation" upon Alaska's admission to the Union, because the application had not yet been granted. Report 464 (first emphasis added). Since the application and regulation did not withhold the lands within the Range from Alaska under §6(e) of the Alaska

Statehood Act, the Master concluded that coastal submerged lands within the Range passed to Alaska upon its admission to the Union. Because real property used for conservation of wildlife, but not set apart as a wildlife refuge or reservation, would have been transferred to Alaska, the Master's approach arguably calls into question federal ownership of *uplands* as well as submerged lands within the Range. See *infra*, at 60–61.

Alaska had argued in the alternative that, even if the application was effective to prevent submerged lands within the Range from passing to Alaska at statehood, the boundaries of the Range did not embrace certain submerged lands between the mainland and the barrier islands along Alaska's northeastern coast. The Master's recommendation in Alaska's favor on the effect of the application, if accepted, would have made irrelevant the dispute concerning the boundaries of the Range. The Master nevertheless addressed Alaska's alternative argument and resolved the boundary dispute in the United States' favor. Report 478–495. The Master also considered the effect of *Montana* and *Utah Div. of State Lands* on Alaska's ownership of submerged lands within the Range. In supplemental briefing submitted after we decided those cases, Alaska argued that the 1957 application reflected no clear intent to include submerged lands within the Range. Even if the application embraced submerged lands, Alaska asserted, the United States had identified no evidence that Congress intended to defeat Alaska's title to those lands. Relying principally on a statement of justification attached to the 1957 application, the Master found a clear intent to include submerged lands within the Range. That statement of justification described the seacoast as "provid[ing] habitat for polar bears, Arctic foxes, seals, and whales," Alaska Exh. 16 (Memorandum from the Director of the Bureau of Sport Fisheries and Wildlife to the Bureau of Land Management, Nov. 7, 1957, p. 2); the Master reasoned that the drafters of the application "[could] not have thought

this habitat was only upland," Report 496. In addition, the Master noted that the original boundary of the Range was the high water mark along the Arctic Coast; the drafters changed the boundary to the extreme low water mark so as to include the tidelands within the Range. *Ibid.* The Master also found that the application reflected an intent to defeat Alaska's title, pointing out that the reservation was "meant to have permanent effect," not merely to hold whatever submerged lands were made part of the Range until Alaska's admission to the Union. *Ibid.*

The United States excepts to the Special Master's conclusion that the 1957 application and the Department of the Interior regulation, read together, did not have the effect of "setting apart" lands within the Range "as [a] refug[e] . . . for the protection of wildlife." Alaska defends the Master's conclusion concerning the legal effect of the application. Alaska also defends on alternative grounds the ultimate conclusion that submerged lands within the Range passed to Alaska, arguing that the United States did not clearly intend to include submerged lands within the Range and that the United States did not clearly intend to defeat Alaska's title to those lands. In essence, Alaska challenges the Master's conclusion that the 1957 application met the requirements of *Montana* and *Utah Div. of State Lands*—a conclusion appearing in a section of the Report to which it did not except. See Report 495–499. As will become clear, however, although the Master considered separately whether the application had the effect of "setting apart" lands within the Range within the meaning of § 6(e) and whether the requirements of *Montana* and *Utah Div. of State Lands* had been met, those inquiries overlap considerably. We therefore must address the application of *Montana* and *Utah Div. of State Lands* to this case.

A

As with the Reserve, the boundaries of the Range, as drawn by the Master, encompass both submerged lands be-

neath tidelands and inland navigable waters—which would ordinarily pass to Alaska under the equal footing doctrine as confirmed by the Submerged Lands Act—and submerged lands beneath the territorial sea—which would pass to Alaska only by virtue of its Submerged Lands Act grant. As discussed *supra*, at 35–36, Congress has chosen in the Submerged Lands Act to exercise its paramount authority over submerged lands beneath the territorial sea by granting such lands to a coastal State, unless the Federal Government "expressly retained" the lands in question when the State entered the Union.  43 U. S. C. § 1313(a); see § 1301(a). Applying the logic of *Montana* and *Utah Div. of State Lands*, therefore, we ask whether the United States clearly included submerged lands within the Range and intended to defeat state title to such lands.   If it did, the United States will have demonstrated that it "expressly retained" the coastal submerged lands at issue in this case, including tidelands and lands beneath the territorial sea.

### B

The Master examined the legal effect of the 1957 application in one section of his Report and applied the analysis of *Montana* and *Utah Div. of State Lands* in another.   These inquiries overlap significantly, as the Government's argument makes clear.   The Government claims that the 1957 Bureau of Sport Fisheries and Wildlife application reflected the United States' clear intent to include submerged lands within the proposed Range, satisfying the first inquiry under *Utah Div. of State Lands.*   As for the second inquiry, the Government argues that the United States expressly retained all lands within the Range, including submerged lands, with § 6(e) of the Alaska Statehood Act.   That subsection prevented the transfer to Alaska of any lands "set apart" as a refuge.   The Government maintains that the legal effect of the 1957 application was to "set apart" the Range as a refuge.   If so, the Government argues, § 6(e) reflects a clear

congressional intent to defeat state title. We address the terms of the application and the proper interpretation of § 6(e) in turn.

1

It is clear that the 1957 application by the Bureau of Sport Fisheries and Wildlife for withdrawal of lands in northeastern Alaska included submerged lands. The application contained a boundary description beginning from "the line of extreme low water of the Arctic Ocean" at the Canadian border and following "westerly along the said line of extreme low water, including all offshore bars, reefs, and islands" to Brownlow Point. Alaska Exh. 81, p. 3. Because the boundary follows the line of extreme low water, the Range necessarily encompasses the periodically submerged tidelands. The boundary description also expressly refers to certain submerged lands, including offshore "bars" and "reefs." Moreover, a statement of justification accompanying the application illustrates that the Range was intended to include submerged lands beneath other bodies of water. The statement explained that "countless lakes, ponds, and marshes [within the proposed Range] are nesting grounds for large numbers of migratory waterfowl that spend about half of each year in the United States. . . . The river bottoms with their willow thickets furnish habitat for moose. This section of the seacoast provides habitat for polar bears, Arctic foxes, seals, and whales." Alaska Exh. 16, p. 2. As the Master concluded, the drafters of the application would not have thought that the habitats mentioned were only upland. Report 496.

The express reference to bars and reefs and the purpose of the proposed Range each distinguish this case from *Montana* and *Utah Div. of State Lands*. In those cases, we concluded that submerged lands beneath certain bodies of water had not been conveyed or reserved, despite the fact that the bodies of water fell within the boundaries of the conveyance or reservation. Neither case involved an instrument of con-

veyance or reservation that, properly understood, referred to submerged lands. See *Montana*, 450 U. S., at 548, 554; *Utah Div. of State Lands*, 482 U. S., at 203. Moreover, in each case, we focused on the purpose of the conveyance or reservation as a critical factor in determining federal intent. See *supra*, at 38–40. In *Montana*, we reasoned that a conveyance of a beneficial interest in submerged lands beneath a river on the Crow Reservation would not have been necessary to achieve the Government's purpose in creating the reservation, because fishing was not important to the Crow Tribe's way of life. 450 U. S., at 556. Similarly, in *Utah Div. of State Lands*, we concluded that the Federal Government could prevent settlers from claiming lands adjacent to waters suitable for reservoir sites and could control the development of those waters, even if lands beneath the waters in question passed to the State. 482 U. S., at 202, 208. Here, in contrast, the statement of justification accompanying the 1957 Bureau of Sport Fisheries and Wildlife application demonstrated that waters within the boundaries of the Range were an essential part of the habitats of the species the Range was designed to protect, and that retention of lands underlying those waters was critical to the Government's goal of preserving these aquatic habitats.

Alaska resists the conclusion that the application reflected an intent to include submerged lands within the Range on two grounds. First, Alaska focuses on the fact that the application sought only to withdraw lands within the Range from " 'all forms of appropriation under the public land laws' except mineral leasing and mining locations." Reply Brief for State of Alaska 17 (quoting Alaska Exh. 81, p. 1). Relying on language in *Utah Div. of State Lands*, Alaska argues that submerged lands are not subject to disposal under the public land laws and there would have been no need to exempt them from appropriation under those laws. Alaska Opposition Brief 17; see 482 U. S., at 203 (rejecting claim that 1888 Act authorized inclusion of submerged lands in part be-

cause such lands were already exempt from sale, entry, or occupation).

Alaska misreads the application. Although the application did seek to preclude appropriation of lands within the proposed Range under the public land laws (presumably where those laws would otherwise apply), the application had a far broader purpose: to establish a reservation for the use of the Bureau of Sport Fisheries and Wildlife. See Alaska Exh. 81, p. 1 ("The purpose of this withdrawal is to establish an Arctic Wildlife Range within all or such portion of the described lands as may be finally determined to be necessary for the preservation of the wildlife and wilderness resources of that region of northeastern Alaska"). Because the application was not designed solely to prevent appropriation of lands governed by the public land laws, focusing on whether the public land laws reach submerged lands cannot end our inquiry into whether the application embraced submerged lands.

Second, Alaska argues that no "international duty or public exigency" supported the inclusion of submerged lands within the application. As we concluded earlier, however, the United States need only identify an "appropriate public purpose" for conveying or reserving submerged lands. See *supra*, at 40. Creation of a wildlife refuge is an appropriate public purpose that is served by including submerged lands within the refuge. Alaska also appears to suggest that an application alone can *never* reveal an appropriate public purpose, because until the application is granted it cannot be known whether submerged lands are necessary to achieve that purpose. See Reply Brief for State of Alaska 14. If the Secretary of the Interior had granted the withdrawal application before Alaska's statehood—thereby confirming that an appropriate public purpose supported the reservation of submerged lands—Alaska presumably would have no claim that the application had never covered submerged lands in the first place. It follows that Alaska objects not to

the notion that the application covered submerged lands, but rather to the proposition that Alaska's title to submerged lands covered by the application could be defeated even though the application was still pending when Alaska was admitted to the Union. We address below whether the United States could have defeated Alaska's title to lands not yet part of a completed reservation. See *infra*, at 59–61.

Finally, it is important to point out what Alaska does *not* argue at this stage of the proceedings. Alaska does not defend the Master's ultimate recommendation on the alternative ground that the Bureau of Sport Fisheries and Wildlife lacked the authority to include submerged lands within an application to set aside lands for a wildlife refuge. In connection with its exception to the Master's recommendation that the United States retained submerged lands within the Reserve, Alaska argued that Congress had not properly delegated to the Executive its authority under the Property Clause, Art. IV, § 3, cl. 2, to divest a future State of its title to submerged lands. Alaska makes no parallel argument here. Tr. of Oral Arg. 80–81. In any event, the Government does not claim here that Executive actions alone establish in this case that the United States retained submerged lands within the Range. Rather, the Government relies squarely on congressional intent underlying § 6(e) of the Alaska Statehood Act. Our prior discussion of ratification of Executive action applies equally here. See *supra*, at 44–46. There would have been no constitutional impediment to Congress designating a wildlife refuge encompassing submerged lands and retaining title to it upon Alaska's admission to the Union, provided Congress' actions were sufficiently clear to meet the requirements of our submerged lands cases. It follows that Congress could accomplish the same result by recognizing prior Executive actions. We discuss below whether Congress did so here. See *infra*, at 56–61.

In sum, we conclude that the application by the Bureau of Sport Fisheries and Wildlife to withdraw lands for a wildlife refuge reflected a clear intent to reserve submerged lands as well as uplands. The Range's boundary was drawn so that the periodically submerged tidelands were necessarily included within it; the boundary description referred on its face to submerged features such as bars and reefs. Moreover, the purpose of the federal reservation—protecting the habitats of various species found along the coast and in other navigable water bodies within the Range—supported inclusion of submerged lands within the Range.

## 2

We now consider whether, prior to Alaska's admission to the Union, the United States defeated the future State's title to the submerged lands included within the proposed Range.

The Alaska Statehood Act set forth a general rule that the United States would retain title to all property it held prior to Alaska's admission to the Union, while the State of Alaska would acquire title to all property held by the Territory of Alaska or its subdivisions. Pub. L. 85–508, § 5, 72 Stat. 340. There were several exceptions to that provision. Of primary relevance here is § 6(e), which transferred to Alaska "[a]ll real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska . . . [provided] [t]hat such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife . . . ." *Id.*, at 340–341.

In our view, under § 6(e) of the Alaska Statehood Act, the United States retained the Range as lands "withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife," rather than transferring the lands to Alaska. As discussed above, the 1957 application reflected an intent to include submerged lands within the Range. Shortly after

the application was filed, the Secretary of the Interior publicly announced the action. See U. S. Exh. 12 (Department of the Interior Press Release, Nov. 20, 1957); U. S. Exh. 32 (statement of Secretary Seaton). Formal notice of the application was published in the Federal Register in January 1958. 23 Fed. Reg. 364. Moreover, later in 1958, while Congress was considering Alaska's admission to the Union, the Secretary of the Interior informed Congress that the application for the Range was pending and submitted maps showing the area as a federal enclave embracing submerged lands. See U. S. Exh. 61 (Department of Interior, Bureau of Land Management, Alaska: Federal Land Withdrawals and Reservations, July 1958, Section No. 8).[2] By virtue of that submission, Congress was on notice when it passed the Alaska Statehood Act that the Secretary of the Interior had construed his authority to withdraw or reserve lands, delegated by the President, see Exec. Order No. 10355, 3 CFR 873 (1949–1953 Comp.), to reach submerged lands. If the 1957 application in fact had the legal effect of "withdraw[ing] or otherwise set[ting] apart" lands within the proposed Range "as refuges or reservations for the protection of wildlife" within the meaning of § 6(e), then the United States retained title to submerged lands as well as uplands within the Range. This is so despite § 6(m) of the Statehood Act, which applied the Submerged Lands Act of 1953 to Alaska. The Submerged Lands Act operated to confirm Alaska's title to equal footing lands and to transfer title to submerged lands be-

---

[2] Alaska claims that the map submitted to Congress did not depict the Range, but a 1943 withdrawal under Public Land Order 82, 8 Fed. Reg. 1599, revoked, 25 Fed. Reg. 12599 (1960). Five million acres of the land to be included in the Range were covered by PLO 82, and the Secretary of the Interior announced a modification of the terms of PLO 82 and the filing of the application for the Range at the same time. See U. S. Exh. 12, p. 2; U. S. Exh. 32, p. 2. The importance of the map is not that it precisely depicts the Range's current boundaries, but that it shows the area encompassing the Range as a proposed federal enclave embracing submerged lands.

neath the territorial sea to Alaska at statehood, *unless* the United States clearly withheld submerged lands within either category prior to statehood. In § 6(e) of the Statehood Act, Congress clearly contemplated continued federal ownership of certain submerged lands—both inland submerged lands and submerged lands beneath the territorial sea—so long as those submerged lands were among those "withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife."

Under *Montana* and *Utah Div. of State Lands*, an intent to defeat state title to submerged lands must be clear. As this discussion illustrates, the operative provision of the Alaska Statehood Act, § 6(e), reflects a very clear intent to defeat state title. The only remaining question is whether an application by the head of the Bureau of Sport Fisheries and Wildlife, upon which the Secretary of the Interior had not yet acted, had the effect of "withdraw[ing] or otherwise set[ting] apart" lands within the proposed Range "as refuges or reservations for the protection of wildlife" within the meaning of § 6(e).

Under a Department of the Interior regulation first promulgated in 1952, 17 Fed. Reg. 7368, and in effect at the time Congress passed the Statehood Act, an application for a withdrawal temporarily segregated the lands covered by the application. That regulation provided:

> "The noting of the receipt of the application . . . shall temporarily segregate such lands from settlement, location, sale, selection, entry, lease, and other forms of disposal under the public land laws . . . to the extent that the withdrawal or reservation applied for, if effected, would prevent such forms of disposal. To that extent, action on all prior applications the allowance of which is discretionary, and on all subsequent applications, respecting such lands will be suspended until final action on the application for withdrawal or reservation has been taken." 43 CFR § 295.11(a) (Supp. 1958).

58

The regulation temporarily foreclosed any use of the land that a decision by the Secretary of the Interior to grant the application would prevent. It also suspended all pending discretionary applications and all subsequent applications for other uses of the land. This temporary segregation remained in effect unless and until the Secretary of the Interior denied an application. § 295.13(c).

The Special Master adopted the United States' view that the application and the regulation together "set apart" all lands within the Range. Report 464. We agree that this conclusion follows from a straightforward application of § 295.11. Alaska argues that the regulation was not intended to operate on submerged lands. The object of the regulation is quite clear: to prevent, during the pendency of an application, any use of the land that would frustrate federal control if the application were ultimately granted. That goal is implicated wherever a threat to future federal control exists—whether the lands in question are uplands or submerged lands. The State focuses on the fact that the regulation segregates lands from sale, entry, or other forms of disposal, and argues that submerged lands are ordinarily not subject to such forms of disposal. Cf. *Utah Div. of State Lands*, 482 U. S., at 203. But the language in *Utah Div. of State Lands* on which Alaska relies reflects the Court's recognition that under the *general* land laws opening up lands for settlement, private parties ordinarily cannot lay claims to submerged lands. In Alaska, however, *specific* laws had opened up certain submerged lands for mining well prior to the filing of the application for the Range. See, *e. g.*, Act of June 6, 1900, § 26, 31 Stat. 329–330 (providing that "land and shoal water between low and mean high tide on the shores, bays, and inlets of Bering Sea . . . shall be subject to exploration and mining for gold and other precious metals"); Act of May 31, 1938, ch. 297, 52 Stat. 588 (extending provisions beyond the Bering Sea to "the shores, bays, and inlets of Alaska"); Act of Aug. 8, 1947, 61 Stat. 916 (extending

provisions to lands beneath nontidal navigable waters). In light of these provisions, Alaska's premise—that there would have been no need to withdraw or set apart submerged lands to preserve ultimate federal control—is flawed.

Although the Master concluded that the application and regulation together "set apart" all lands within the Range, the Master accepted Alaska's argument that the lands had not been set apart "*as* [a] refug[e] . . . for the protection of wildlife" within the meaning of § 6(e) of the Alaska Statehood Act. (Emphasis added.) The Master found that the application "did not have the same effect as a reservation of lands, dedicating them to a specific public purpose." Report 464. The Master reasoned that under the proviso to § 6(e), the United States would retain ownership only of "wildlife refuges or reservations *already established at statehood.*" *Ibid.* (emphasis added). Because the application had not yet been granted, the proviso to § 6(e) would not prevent the transfer of lands within the Range to Alaska.

We disagree. Under the Master's interpretation, § 6(e) applies only to completed reservations of land. But Congress did not limit § 6(e) to completed reservations. Rather, Congress provided that the United States would not transfer to Alaska lands "withdrawn or *otherwise set apart* as refuges" for the protection of wildlife. (Emphasis added.) The Master's reading of § 6(e) would render the broader terminology superfluous. The Court will avoid an interpretation of a statute that "renders some words altogether redundant." *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 574 (1995). In light of Congress' clear intent, it was error for the Master to conclude that the lands within the Range were not "otherwise set apart as [a] refug[e]" unless the United States could point to a completed reservation. In the phrase "set apart as [a] refug[e]," the word "as" does not carry the requirement that the refuge be presently established; the phrase aptly describes the administrative segregation of lands designated to become a wildlife refuge. Accordingly, the application

and regulation, taken together, placed the Range squarely within the proviso of § 6(e), preventing a transfer of lands covered by the application to Alaska.

The partial dissent's contrary conclusion rests on the view that the lands covered by the application "had no certainty of ever becoming a refuge or reservation." *Post*, at 71 (THOMAS, J., concurring in part and dissenting in part). But the dissent identifies nothing in § 6(e) requiring "certainty" that a projected final action will in fact occur, converting lands designated for a particular use into lands so used, in order for § 6(e)'s proviso to prevent the transfer of such lands to Alaska. Moreover, our reading of the proviso of § 6(e) is reinforced by Alaska's concession that the *uplands* within the Range are held by the United States, not Alaska. Tr. of Oral Arg. 79; Letter from Attorney General Bruce M. Botelho to the Clerk of the Court, Mar. 3, 1997, p. 1. If the Master were correct that the application and regulation did not operate to "set apart" *submerged* lands in the proposed Range within the meaning of § 6(e), then it follows that the same instruments could not set apart *uplands* within the Range. Nevertheless, Alaska disclaims ownership of the uplands. The State argues that it could only have claimed uplands within the Refuge under § 6(b) of the Alaska State-hood Act, which authorized Alaska to select a specified amount of "vacant, unappropriated, and unreserved" federal land. Since Alaska did not select the uplands before the Secretary of the Interior approved the application for the Range in 1960, and since after 1960 the uplands were no longer "vacant, unappropriated, and unreserved," the State cannot now argue that it owns the uplands. *Ibid.* But the State's argument ignores the main clause of § 6(e). Under that clause, the United States transferred to Alaska "[a]ll real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska . . . ." The State does not explain why all

of the lands within the Range—uplands as well as submerged lands—would not have been transferred to Alaska at statehood as real property used for the protection of wildlife unless covered by the proviso. Unless all lands—submerged lands and uplands—covered by the application were "set apart" within the meaning of the proviso to § 6(e), they would have passed to Alaska under the main clause of § 6(e). There is no basis for concluding that the United States retained uplands but not submerged lands within the Range.

## C

In sum, we conclude that the United States did not transfer to Alaska submerged lands within the Range at statehood. The 1957 application to create the wildlife refuge clearly encompassed submerged lands. Since its seaward boundary is the low-water line along Alaska's coast, the Range necessarily encompasses the tidelands. Further reflecting an intent to withhold submerged lands is the statement of justification accompanying the application, which describes the habitat of various species along the coast and beneath inland waters. A Department of the Interior regulation in effect when the application was filed and when Congress passed the Alaska Statehood Act operated to "segregate" the lands for which the application was pending. Section 6(e) of the Alaska Statehood Act expressly prevented lands that had been "set apart as [a] refug[e]" from passing to Alaska. It follows that, because all of the lands covered by the 1957 application had been "set apart" for future use as a refuge, the United States retained title to submerged lands within the Range. We therefore sustain the United States' exception to the Master's recommendation.

## VI

We overrule Alaska's exceptions to the Special Master's recommended rulings that (1) Alaska's submerged lands in the vicinity of barrier islands should be measured as a 3-mile

belt from a coastline following the normal baseline under the Convention on the Territorial Sea and the Contiguous Zone; (2) Dinkum Sands is not an island constituting part of Alaska's coastline under the Submerged Lands Act; and (3) submerged lands beneath tidally influenced waters within the boundary of the National Petroleum Reserve-Alaska did not pass to Alaska at statehood. We sustain the United States' exception to the Special Master's recommended ruling that offshore submerged lands within the boundaries of the Arctic National Wildlife Refuge passed to Alaska at statehood.

The recommendations of the Special Master are adopted to the extent that they are consistent with this opinion. The parties are directed to prepare and submit an appropriate decree for this Court's consideration. The Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as from time to time may be determined necessary or advisable to effectuate and supplement the forthcoming decree and the rights of the respective parties.

The parties shall bear their own costs.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, concurring in part and dissenting in part.

I agree with the Court that the limit of inland waters in the area of Stefansson Sound should be determined by reference to the Convention on the Territorial Sea and the Contiguous Zone, in which Alaska's proposed 10-mile rule finds no purchase. I also agree that Dinkum Sands is not an island within the meaning of the Convention. Accordingly, I join Parts I, II, and III of the Court's opinion. I do not share the Court's view that the United States holds title to submerged lands within National Petroleum Reserve Number 4. Nor do I agree with the Court's conclusion that, "at the time of [Alaska's] statehood," the then-unapproved application to create the Arctic Wildlife Range "expressly

retained" the submerged lands within the boundaries described in that application under the Submerged Lands Act. I thus respectfully dissent from Parts IV and V of the Court's opinion.

I

I turn first to the Court's discussion of the National Petroleum Reserve. The Master's Report posited two possible measures for the specificity with which Congress must declare its intent to retain submerged lands that would otherwise pass to a new State. For those lands under inland waters—lands historically viewed as held by the United States "for the ultimate benefit of future States," *Utah Div. of State Lands* v. *United States*, 482 U. S. 193, 201 (1987) (internal quotation marks omitted)—the Special Master employed a strict presumption of state ownership. The Master determined that lands under the territorial sea—those lands vested in the States solely by the Submerged Lands Act— ought to be presumed to remain in federal hands under "the principle that federal grants are to be construed strictly in favor of the United States." *California ex rel. State Lands Comm'n* v. *United States*, 457 U. S. 273, 287 (1982).

It is my view, however, that, since the enactment of the Submerged Lands Act, the test for determining whether submerged lands—inland or territorial—are conveyed to a newly created State or retained by the United States is that set forth in the Act.

Following in the wake of our decision in *United States* v. *California*, 332 U. S. 19 (1947), as it did, the Submerged Lands Act is widely recognized for having deeded to coastal States the submerged lands lying within 3-mile bands surrounding their coasts. See § 3(a), 43 U. S. C. § 1311(a); see also *United States* v. *Maine*, 420 U. S. 515, 525 (1975). The Act declared it in the

"public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within

such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States . . . ." § 3(a).

The definition of "lands beneath navigable waters" included those submerged lands under the territorial sea. See § 2(a)(2), 43 U. S. C. § 1301(a)(2). The Act's undertaking to "ves[t] in and assig[n] to" the States the rights to those lands thus conveyed to the States lands that this Court had found in *United States* v. *California* to be exclusively federal enclaves. The definition of "lands beneath navigable waters" also included those lands beneath *inland* waters. See § 2(a)(1) (defining "lands beneath navigable waters" to include "all lands within the boundaries of each of the respective States which are covered by *nontidal* waters that were navigable" (emphasis added)). Accordingly—and the majority and I agree to this point—coastal States entering the Union after the passage of the Submerged Lands Act gained title to offshore submerged lands and to inland submerged lands through the operation of that statute.

Section 3, which conveyed and confirmed the States' title to submerged lands, was subject to a series of exceptions. As relevant here, § 5 of the Act excepted from § 3's terms "all lands *expressly retained* by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea)." § 5(a), 43 U. S. C. § 1313(a) (emphasis added). As to lands beneath the marginal (or territorial) sea, it is undisputed that the "expressly retained" exception sets forth the test for determining whether a withdrawal or reservation of land by the United States is effective in preventing conveyance of title to submerged lands. It seems clear to me that it is also the test for determining whether the United States

has retained title to inland submerged lands. Section 3(a) lands include those beneath both inland and territorial waters. In the case of a State, like Alaska, that received title to *all* of its submerged lands by virtue of the Submerged Lands Act, there is no need to consult conflicting presumptions, two-part tests, or anything other than the stated policy on which Congress has finally settled.[1]

The Court seems to agree with me that the Act is now the expression of Congress' policy on submerged lands retention. But, the Court also seems to view the phrase "expressly retained" in the Act as shorthand for the test we employed in *Utah Div. of State Lands,* a case decided three decades after passage of the Act. That is, to determine whether submerged lands have been "expressly retained," we must determine whether Congress "*clearly intended* to include land under navigable waters within the federal reservation," and whether Congress "*affirmatively intended* to defeat the future State's title to such land." 482 U. S., at 202 (emphases added). I find the Court's reading of the "expressly retained" language curious. First, as I discuss below, the language does not lend itself to the Court's construction. Second, it is not the case that the test set forth in *Utah Div. of State Lands* was simply a restatement of the test employed by the Court before the enactment of the Submerged Lands Act. Were it so, then the majority's assertion that the standard in the Act was described in pre-Act cases and simply "carried forward," *ante,* at 36, into *Utah Div. of State Lands* might be colorable. As it happens, in *Utah Div. of*

---

[1] It is, I think, an open question whether the Submerged Lands Act has any operation as to land beneath inland waters in States that entered the Union prior to its enactment, thus initially obtaining title to submerged lands independently of the Act. Determining whether and how the Act applies to pre-existing States involves, at the least, complex retroactivity questions not presented by this case, given that Alaska became a State after the enactment of the Submerged Lands Act, which Alaska's Statehood Act expressly incorporates.

*State Lands,* the Court addressed for the first time the argument that a retention—as opposed to a conveyance—of submerged lands by the United States could defeat a future State's title to those lands, 482 U. S., at 200. In response, the Court crafted the two-part test relied on by the majority today. *Id.,* at 202. Whatever can be said of that test, it was not before the drafters of the Submerged Lands Act. Accordingly, there is no reason to believe that, when Congress employed the phrase "expressly retained," it intended a meaning not obvious from those words and not set forth in an opinion of this Court until three decades after the Act became effective.

But the Submerged Lands Act, I think, embraces at least part of the policy that we had attributed to Congress in several pre-Act cases. We have, for example, stated that we would not affirm a conveyance of inland submerged lands that was not set out in "clear and especial words," *Martin* v. *Lessee of Waddell,* 16 Pet. 367, 411 (1842), or "unless the claim . . . in terms embraces the land under the waters of the stream," *Packer* v. *Bird,* 137 U. S. 661, 672 (1891). It is, I believe, the meaning of these passages that "expressly retained" captures. Because the only "lands" described in § 3(a) of the Act are *submerged* lands, the requirement that any retention of them be "expres[s]" means that the retention must "in terms embrac[e] the land under the waters." Accordingly, contrary to the Master's conclusion and much of the majority's analysis, a retention of lands cannot be inferred from, for example, the purpose of a given attempted federal undertaking. To be sure, prior to the passage of the Submerged Lands Act, the Court looked beyond the words used in efforts to prevent passage of submerged lands to newly created States. For example, in *United States* v. *Holt State Bank,* 270 U. S. 49 (1926), the Court noted that "disposals by the United States during the territorial period are *not lightly to be inferred,* and should not be regarded as intended unless the intention was definitely declared or *other-*

*wise made very plain." Id.*, at 55 (emphases added). After the enactment of the Submerged Lands Act, it appears that not only is retention of submerged lands not "lightly to be inferred," it is not to be inferred at all. In this respect, Congress has required of itself a higher standard than either the Master or the majority attribute to it.[2]

Neither the Master, in his exhaustive Report, nor the majority, in its only slightly less exhaustive opinion, cites anything meeting what I believe to be the requirement of an express retention of submerged lands within the boundaries of the National Petroleum Reserve. The majority focuses, instead, on the *"purpose* of a conveyance or reservation" as a "critical factor in determining federal intent." *Ante*, at 39 (emphasis in original). The Court concludes that the purposes for establishing the Reserve—primarily to ensure federal possession of petroleum resources within the Reserve's boundaries—would be undermined if the United States did not retain the submerged lands. So "[i]t is simply not plausible," says the majority, "that the United States sought to reserve only the upland portions of the area." *Ante*, at 39–40. To me, these considerations are wholly beside the point. Congress, when it incorporated the Submerged Lands Act into § 6(m) of the Alaska Statehood Act, Pub. L. 85–508, 72 Stat. 343, demanded of itself an *express* retention of submerged lands to prevent their passage to Alaska. If Congress had the purpose attributed to it by the majority, the best way—indeed, the only legal way—for it to realize that purpose was to state "expressly" that the submerged lands inside the

---

[2] Section 5(a)'s standard is at the same time somewhat more generous to the United States. In *Utah Div. of State Lands* v. *United States*, 482 U. S. 193 (1987), we asserted that a reservation—as opposed to a conveyance—of land would not be held to defeat state title to submerged lands even if those lands were manifestly included in the reservation where there was lacking an indication from Congress that it "affirmatively" intended to defeat a future State's title to those lands. See *id.*, at 202. This was, we thought, required by congressional policy. I do not, however, perceive that requirement in the language of § 5(a).

National Petroleum Reserve were retained for the United States. It may well be, as the majority concludes, that Congress can retain lands by ratification of or reference to an earlier instrument describing those lands (the majority points here to President Harding's 1923 Executive Order). But, congressional ratification of an instrument that does not—as President Harding's order does not—"in terms embrac[e] the land under the waters" cannot, anymore than a statute that fails to do so, constitute an express retention as required by the Submerged Lands Act.[3]

Absent an express retention of submerged lands, the Submerged Lands Act effected the transfer of all submerged lands within the Territory of Alaska to the State of Alaska—including those within the boundaries of National Petroleum Reserve Number 4. I dissent from the Court's contrary conclusion.

## II

The majority rejects the Master's recommendation that Alaska be found to hold title to the submerged lands within the Arctic National Wildlife Refuge. Although I acknowledge that the question is close, I agree with the Master and would overrule the United States' exception.[4]

---

[3] The majority points to a prestatehood enactment, Pub. L. 85–303, §2(a), 71 Stat. 623, granting certain offshore lands to the Territory of Alaska, but excepting from that grant "'oil and gas deposits located in the *submerged lands*'" along the Arctic coast of the Reserve. See *ante,* at 42 (emphasis in original). This statute is said to "reinforc[e]" the "conclusion that Congress was aware when it passed the Alaska Statehood Act that the Reserve encompassed submerged lands." *Ibid.* But the statute proves little more than that Congress was, *circa* Alaska's statehood, capable of expressly referring to submerged lands. It does not—and the majority does not claim that it could—operate as an express retention.

[4] This conclusion arises out of my review of the United States' exception to the Master's recommendation on Question 9. Before I turn to it, I must admit some bafflement as to why the majority undertakes a review of the Master's recommendation on Question 10. See *ante,* at 51–55. In answer to Question 10, the Special Master, using reasoning parallel to that of his discussion of National Petroleum Reserve No. 4, concluded that the

The United States contends that the submerged lands within the Refuge were "expressly retained" when Alaska became a State. Section 5 of the Alaska Statehood Act keeps for the United States "title to all property, real and personal, to which it has title, including public lands." 72 Stat. 340. The various subsections of § 6 of the Statehood Act exclude from that general retention a variety of lands. Section 6(e) provides that federal agencies will "transfe[r] and conve[y]" to Alaska "[a]ll real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska" under three statutes. *Ibid.* A proviso to § 6(e), however, states that "such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife." *Id.*, at 341.[5]

The United States contends that the Refuge was, as of Alaska's statehood, "set apart as [a] refug[e]." This was accomplished, it is argued, by means of an application filed with the Secretary of the Interior in November 1957 by the Bureau of Sport Fisheries and Wildlife "to establish an Arctic Wildlife Range" within certain lands in Alaska's northeastern corner. See Report of Special Master 447, n. 1 (Report)

application for withdrawal of the land within the Refuge included submerged lands. Alaska failed to file an exception to that recommendation, and we have no more occasion to take it up than any of the several other questions on which the Master offered recommendations to which neither party has objected. Because it is not before us, I express no view on the Master's conclusion as to Question 10.

[5] The term "lands" employed in § 6(e) is presumably to be read *in pari materia* with the same term in § 5. Section 5 makes no express mention of submerged lands, so one can inquire whether, under the Submerged Lands Act, § 5 (never mind § 6(e), which, as a proviso to an exception to § 5, cannot outstrip § 5) "expressly retained" submerged lands for the United States. Alaska, in forgoing its right to except to the Master's recommendation as to Question 10, has, I think, given up its opportunity to make any such argument and I will not take it up.

(citing Alaska Exh. 81).[6]   The Government does not argue
that the Refuge was "withdrawn" by the application within
the meaning of § 6(e).   See Brief for United States 41; Re-
port 463.   Rather, the application falls within § 6(e) because,
we are told, the application "was the legal mechanism by
which the Interior Department at that time 'set apart' public
lands for the creation of a wildlife refuge."   Brief for United
States 41.   Under the Department of the Interior's regula-
tions in effect at the time, the effect of an application was to
"temporarily segregate such lands from settlement, location,
sale, selection, entry, lease, and other forms of disposal under
the public land laws, . . . to the extent that the withdrawal
or reservation applied for, if effected, would prevent such
forms of disposal."   43 CFR § 295.11(a) (1958), 22 Fed. Reg.
6614 (1957).   The regulation further provided that "[s]uch
temporary segregation shall not affect the administrative
jurisdiction over the segregated lands."   *Ibid.*

The Master acknowledged the regulation's effect, but de-
termined that, while it may have been to "set apart" the
submerged lands within the Range, the lands were not "set
apart *as* a refuge or reservation."   Report 464 (emphasis in
original).   The majority disagrees, asserting that "[i]n the
phrase 'set apart as [a] refug[e],' the word 'as' does not carry
the requirement that the refuge be presently established."
*Ante,* at 59.   "[T]he phrase," concludes the majority, "aptly
describes the administrative segregation of lands designated
to become a wildlife refuge."   *Ibid.*

I disagree.   As the language of the Bureau of Sport Fish-
eries and Wildlife's application made clear, at the time of the
application (and at the time of statehood), no one could say
with any certainty what lands—if any—included within the
boundaries set forth in the application were at that time
"designated to become a wildlife refuge."   See Report 447,

---

[6] The United States no longer contends that the application, of its
own force, "expressly retained" submerged lands.   See Brief for United
States 29.

n. 1 ("'The purpose of this withdrawal is to establish an Arctic Wildlife Range within all or *such portion of the described lands as may be finally determined to be necessary* for the preservation of the wildlife and wilderness resources of that region of northeastern Alaska'" (quoting Alaska Exhibit 81, p. 1) (emphasis added)).   Not only was it unknown whether the lands (or any of them) would ultimately become a refuge or reservation, but also, during the pendency of the application, the "administrative jurisdiction" over the lands remained with the Bureau of Land Management.   See 43 CFR § 295.11(a) (1958).   The Fish and Wildlife Service did not begin to administer the Refuge until the application for it was finally adopted after Alaska's statehood.   See Report 464.   As of the time of the Alaska Statehood Act, the lands within the application had no certainty of ever becoming a refuge or reservation, and were not then administered as one.

This is not to say that the application and regulation did not have any effect on the lands described in the application. The lands within the application were, by operation of the regulation, free from certain "forms of disposal" during the pendency of the application.   43 CFR § 295.11(a) (1958).   I am willing to agree with the Master and the majority that, under the regulation, the lands were "set apart."   But, they were "set apart" temporarily and merely to preserve the status quo pending the Secretary's decision on the application in order that a decision by the Secretary that such lands should become a refuge or reservation would not be a nullity. Contrary to the suggestion of the United States that the regulation "was the legal mechanism by which the Interior Department at that time 'set apart' public lands for the creation of a wildlife refuge," Brief for United States 41, that regulation applied to all applications for withdrawals or reservations of land, not merely those to create wildlife refuges. See, *e. g.,* 43 CFR § 295.9 (1958) (listing who may apply for withdrawals or reservation without limitation to agencies

seeking to create wildlife refuges). In my view, then, the Master overstated the effect of the application and regulation when he said that they "caused land to be set apart *for the purpose of a wildlife reservation.*" Report 464 (emphasis added). The effect of the set-apart was to ensure that any decision to create a wildlife refuge—if that were the decision ultimately made—would not be undermined by prior land actions adverse to any such decision. Only if the procedures that intervened between the Bureau's application and the Secretary's decision were merely ministerial, which the Government is wise not to argue, see 43 CFR § 295.12 (1958) (describing procedures), could the set-apart be accurately described as *"for the purpose* of a wildlife reservation." Thus, it goes without saying that I do not agree with the majority's even more ambitious conclusion that the lands were "set apart *as* [a] refug[e]."[7]

Nor do I agree with the majority's contention that the Master's reading would render the "otherwise set apart" portion of § 6(e) redundant, as only a "completed reservation" of land would prevent that land from passing to Alaska. *Ante,* at 59. I believe that the proviso in § 6(e) is set forth in broad language in an attempt to capture all ways in which a refuge or reservation for the protection of wildlife can be created—not unlike Congress' attempt in § 3(a) of the Submerged Lands Act to capture every way in which title to submerged lands could be conferred. See *supra,* at 63. Accordingly, Congress' use of the phrase "lands withdrawn or otherwise set apart" fairly encompasses every way in which lands can be segregated "as refuges or reservations." Re-

---

[7] That Alaska has acquiesced in the United States' ownership of the uplands within the boundaries of the Refuge says nothing whatever about Congress' intent in enacting the Alaska Statehood Act. Accordingly, I do not understand the majority's citation to this point. *Ante,* at 60. Indeed, if Alaska's poststatehood actions are relevant, it must surely be equally relevant that Alaska strenuously *disputes* ownership of the submerged lands within the Refuge.

quiring a completed refuge or reservation—by whatever means created—does not render any portion of the proviso redundant.

For these reasons, I conclude that the Master correctly determined that the Bureau's application was not sufficient for purposes of § 6(e)'s proviso. I would overrule the United States' exception to his recommendation.

## III

I would overrule Alaska's exceptions to the Master's recommendation on the method for determining the limits of Alaska's offshore submerged lands, and his recommendation concerning Dinkum Sands' insular status. I concur with the majority on these two points. I would also overrule the United States' exception to the Master's recommendation concerning the Arctic Wildlife Refuge. And, finally, I would sustain Alaska's objection to the Master's recommendation as to the ownership of submerged lands within National Petroleum Reserve No. 4. On these last two points, I respectfully dissent.